# UNITED STATES DISTRICT COURT

__NORTHERN__    DISTRICT OF    __ILLINOIS, EASTERN DIVISION__

MAGISTRATE JUDGE VALDEZ

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

BARRY WARE,
aka ""B", "Buckethead", "Beanhead", "Sweet Nuts",
and "Penelope", and the defendants on the attached
list.

**CASE NUMBER**

MAGISTRATE JUDGE VALDEZ

# 08CR 0122

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  Starting no later than January 2007, and continuing until the present, at Joliet, in Will County, in the Northern District of Illinois, and elsewhere, defendants did,

FILED
2-11-08
FEB 1 1 2008

conspire with each other, and with others, to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely,  5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1),

in violation of Title ___21___ United States Code, Section 846 and Title 18, United States Code, Section 2.

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes _____ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

February 11, 2008
Date

at    Chicago, Illinois
City and State

MARIA VALDEZ, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

1.   BARRY WARE, aka "B", "Buckethead", "Beanhead", "Sweet Nuts", and Penelope;
2.   GREGORIO RODRIGUEZ, aka "George";
3.   GARY McDONALD, aka "Worm";
4.   DEVON TYLER, aka "D";
5.   GERALD LINDSEY, aka "Worm";
6.   KEVIN WADDELL, aka "KK", "Benny", and "Soda Pop";
7.   TERRY PETEN, aka "T" and "Marv";
8.   MELVIN HOLMES;
9.   JERMAINE McCANN;
10.  BOBBY MITCHELL, aka "Mitch"; and
11.  LAQUINTA MOFFETT, aka "LuLu", "Big Girl", and "Quinta"

STATE OF ILLINOIS  )
        )
COUNTY OF COOK  )

## **AFFIDAVIT**

  Jeremy L. Resar, being duly sworn, deposes and states as follows:

## I. **INTRODUCTION**

  1.  I am a Special Agent with the Federal Bureau of Investigation (hereinafter "FBI"),

United States Department of Justice, and have been so employed for approximately sixteen months.

I have received specialized training in drug investigations while employed as a Special Agent.  I am

familiar with and have participated in all of the normal methods of investigations, including but not

limited to visual surveillance, general questioning of witnesses, use of search warrants,  informant

and cooperating witness debriefings, pen registers, document analysis, and the utilization of

undercover agents/officers.  I have been personally involved in investigations of drug-related

offenses involving the possession, sale, and distribution of cocaine, heroin, and crack cocaine in the

south suburbs of the Chicago metropolitan area, and investigations involving the distribution of these

substances by members of street gangs in the south suburbs of the Chicago metropolitan area.

  2.  I am currently assigned to the South Resident Agency, which investigates, among

other crimes, drug trafficking crimes in and around the south suburbs of the Chicago metropolitan

area.  Prior to becoming a Special Agent with the FBI, I worked as an Assistant District Attorney in

Milwaukee, Wisconsin for over six and one-half years.  My most recent assignment with the

Milwaukee County District Attorney's Office was to the Milwaukee High Intensity Drug Trafficking

Area (hereinafter "Milwaukee HIDTA") task force.  As a prosecutor with Milwaukee HIDTA, I

participated in long term investigations of violent criminal organizations that trafficked illegal drugs.

I drafted and reviewed search warrant applications, pen register and trap and trace applications, and

applications for surreptitious GPS installations.  During those investigations, I have worked to identify co-conspirators through the use of confidential informants, drug ledgers, telephone records and bills, photographs, financial records, as well as other means.

3.  As a prosecutor, I also introduced interceptions from a court authorized interception of wire communications during a drug trafficking conspiracy trial.  Prior to my assignment to Milwaukee HIDTA, I was assigned to the Milwaukee County District Attorney's Community Prosecution Unit where I worked with officers from the Milwaukee Police Department to investigate street level drug trafficking. In total, while employed with the Milwaukee County District Attorney's Office, I prosecuted several hundred drug cases.  Through this experience and my experience as a Special Agent with the FBI, I am familiar with the methods in which drug traffickers conduct their business, including, but not limited to, their:

     a.    methods of importing and distributing illegal drugs;

     b.    use of cellular telephones;

     c.    use of homes and businesses to store illegal drugs and conduct meetings; and

     d.    use of code words to conduct illegal drug transactions.

4.  The information contained in this Affidavit is based on my conversations with and review of reports prepared by agents in the FBI, as well as other law enforcement agents and officers; the results of physical surveillance; information provided by cooperating witnesses; law enforcement's interviews of witnesses; and law enforcement's review of recordings of consensually recorded conversations and conversations intercepted pursuant to Court orders authorizing the interception of wire communications. Since this Affidavit is being submitted for the limited purpose of establishing probable cause as set forth herein, I have not included each and every fact known to me concerning this investigation.

5.      This affidavit is made for the purpose of establishing probable cause in support of a criminal complaint charging:

a.   BARRY WARE, also known as (hereinafter "aka") "B", "Buckethead", "Beanhead", "Sweet Nuts", and "Penelope";
b.   GREGORIO RODRIGUEZ, aka "George";
c.   GARY McDONALD, aka "Worm";
d.   DEVON TYLER, aka "D";
e.   GERALD LINDSEY, aka "Big Gerald";
f.   KEVIN WADDELL, aka "KK", "Benny", and "Soda Pop";
g.   TERRY PETEN, aka "T" and "Marv";
h.   MELVIN HOLMES;
i.   JERMAINE McCANN;
j.   BOBBY MITCHELL, aka "Mitch"; and
k.   LAQUINTA MOFFETT, aka "LuLu", "Big Girl", and "Quinta";

with conspiring with each other and with others to knowingly and intentionally possess with intent to distribute and to distribute controlled substances, namely, 5 kilograms or more of mixtures and substances containing cocaine, and 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of United States Code, Section 846, and Title 18, United States Code, Section 2.

6.      This affidavit is also made for the purpose of establishing probable cause in support of warrants to seize the vehicles listed below:

a.      2006 Dodge Charger - VIN 2B3KA53H16H178557 (registered to Individual A) *see* ¶¶ 22, 32;

b.      2000 Buick Park Avenue - VIN 1G4CW52K2Y4166785 (registered to BARRY WARE) *see* ¶¶ 22, 28;

c.      2004 Honda Pilot - VIN 2HKYF186X4H570483 (Registered to Individual B and Individual C) *see* ¶¶ 113-114;

d.      2007 Dodge Caliber - VIN 1B3HB28B77D239919 (Registered to Individual D) ¶¶ 166-167; and

3

e.    1997 Lexus ES 300 - VIN JT8BF22G0V0033843 (Registered to BOBBY

MITCHELL) ¶¶ 68, 71, 198, 201-204.

## II.    OVERVIEW OF THE CONSPIRACY

7.    Since approximately November 2006, the FBI and the Joliet Police Department

(hereinafter "JPD") have been conducting a joint investigation of the BARRY WARE drug

trafficking organization (hereinafter "the WARE Organization") in the Joliet, Illinois area. During

the course of the investigation, agents have obtained historical information from confidential

witnesses, intercepted wire communications between WARE and members of the WARE

Organization pursuant to court orders, conducted surveillance of BARRY WARE and members of

the WARE Organization, conducted controlled buys of narcotics from BARRY WARE and members

of the WARE Organization, and seized narcotics from members of the WARE Organization. Based

on the investigation to date, the WARE Organization is responsible for the distribution of wholesale

quantities of cocaine and crack cocaine in the Joliet area.

8.    The following is a brief summary of the roles each co-conspirator played in the

conspiracy and the paragraphs in this Affidavit pertaining to each:

a.    **BARRY WARE:** is the leader of the WARE Organization. BARRY WARE

controls the purchase of and distribution of wholesale quantities of cocaine and crack cocaine for the

WARE Organization. BARRY WARE further controls the collection and distribution of narcotics

proceeds for the WARE Organization. *See* ¶¶

b.    **GREGORIO RODRIGUEZ:** supplies wholesale quantities of cocaine to

BARRY WARE and the WARE Organization. *See* ¶¶ 18, 92-94, 96-99, 101, 103-104, 106-108,

111-114, 116, 118, 121, 132 and 162.

c.    **GARY McDONALD:** purchases and distributes wholesale quantities cocaine and crack cocaine for the WARE Organization. *See* ¶¶ 14, 18, 20-21, 25-26, 41-43, 59-63, 72, 89, 108-110, 116, 118-126, 131-132, 138, 142-143, 147, 156-159, 163-164, 194-195, 207, 219-223, and 225.

d.    **DEVON TYLER:** purchases and distributes wholesale quantities of cocaine and crack cocaine for the WARE Organization. *See* ¶¶ 13, 18, 42-43, 57-60, 84, 89, 116, 118-132, 210-213, and 215-216.

e.    **GERALD LINDSEY:** purchases and distributes wholesale quantities of cocaine and crack cocaine for the WARE Organization. *See* ¶¶ 27, 61-62, 117, 136-137, 144, 183-193, and 208-209.

f.    **KEVIN WADDELL:** purchases and distributes wholesale quantities of cocaine and crack cocaine for the WARE Organization. *See* ¶¶ 12, 18, 23, 60, 90-91, 107, 128, 130, 136-137, 140, 144, 150-151, and 165-168.

g.    **TERRY PETEN**: purchases and distributes wholesale quantities of cocaine and crack cocaine for the WARE Organization. *See* ¶¶ 73-77, 80-81, 83, 88, and 139.

h.    **MELVIN HOLMES**: distributes wholesale quantities of cocaine and crack cocaine for the WARE Organization from HOLMES's residence. *See* ¶¶ 23, 47-48, 55-56, 67-71, 73, 85, 87, 133, 142, 154-156, and 196.

i.    **JERMAINE McCANN:** purchases wholesale quantities of cocaine and crack cocaine from the WARE Organization. *See* ¶¶ 44-45, 49-51, and 64.

j.    **BOBBY MITCHELL:** purchases wholesale quantities of cocaine and crack cocaine from the WARE Organization. *See* ¶¶ 6, 18, 46-48, 52-56, 65-71, 85-87, 179-182, 196-206, and 228.

k.    **LAQUINTA MOFFETT:** courier who distributes wholesale quantities of cocaine and crack cocaine and collects narcotics proceeds for the WARE Organization. *See* ¶¶ 100, 160-162, 196-202, and 205.

## III.    OVERVIEW OF THE INVESTIGATION

### A.    The Confidential Sources

9.    <u>Confidential Source 1 ("CS-1")</u>

a.    CS-1 provided credible, reliable, and timely information to the FBI between January 2007 and May 30, 2007. Prior to that time, CS-1 had been cooperating with the Joliet Police Department since November 2006, following his/her arrest for a narcotics and firearms offense. CS-1 cooperated with the FBI and JPD in hopes that he would not be charged for the offense underlying his/her November 2006 arrest. During the course of the investigation, CS-1 was paid $1,000 for his/her cooperation by the FBI. JPD provided the source with $210 to assist him/her with rent. CS-1 has two prior felony drug convictions.[1] The information CS-1 provided is based on CS-1's conversations with BARRY WARE and other members of the WARE Organization, and on CS-1's personal observations.

b.    CS-1 has known BARRY WARE since the 1970s. Between August 2006 and November 2006, WARE fronted approximately 4 ½ ounces of cocaine to CS-1 every week. CS-1 resold the cocaine in smaller quantities to customers in the Joliet area. During that same period of time, CS-1 brokered multiple transactions, each of which involved approximately 2 1/4 ounces of

---

[1] In 1997, CS-1 cooperated with a federal investigation of a drug trafficker in hopes of receiving a reduced sentence in connection with a then-pending drug case. In 1998, CS-1 testified before the district court at a trial and at a sentencing hearing relating to that case. At the sentencing hearing, CS-1 recanted his/her trial testimony. CS-1 subsequently withdrew his/her recantation. The district court judge later determined that CS-1's trial testimony was accurate and that CS-1's recantation was false. The appellate court did not overrule the district court judge's findings regarding CS-1's credibility.

cocaine, between WARE and a cocaine customer of CS-1.

10.    Confidential Source 2 ("CS-2")

a.    CS-2 provided credible, reliable, and timely information to the FBI from approximately February 2007 until November 2007. Prior to that time, CS-2 had been cooperating with JPD since November 2006, following his/her arrest for a narcotics and firearms offense. CS-2 has entered a plea of guilty to those charges. CS-2 cooperated with the FBI in hopes of receiving a reduced sentence on the state charges to which he entered a plea of guilty. CS-2 has not yet been sentenced. CS-2 has approximately eight misdemeanor convictions for various offenses, including possession of cannabis. The FBI and JPD did not pay CS-2 for his/her cooperation. The information CS-2 provided is based on CS-2's conversations with Individual HH.

b.    CS-2 has known BARRY WARE since 2004. CS-2 has not actively participated in the activities of the WARE Organization, and met WARE through a friend, Individual HH. CS-2 admitted that between 2001 and 2004, CS-2 sold wholesale quantities of cocaine to Individual HH.

11.    Confidential Source 3 ("CS-3")

a.    CS-3 has been providing reliable, credible, and timely information to the FBI since September 2007. CS-3 is cooperating with the FBI in hopes of receiving a reduced sentence for a cocaine possession and distribution case stemming from CS-3's arrest in July 2007 by the JPD for possession of cocaine. CS-3 has been arrested on numerous occasions, most recently in December 2007 for possession of a weapon by a felon, and has several convictions, including a 1998 conviction for unlawful possession of a weapon by a felon, a 1998 conviction for possession of a controlled substance, and a 2004 conviction for aggravated use of a firearm. The FBI and the JPD have not paid CS-3 for his/her cooperation. The information CS-3 provided is based on CS-3's

7

conversations with BARRY WARE and other members of the WARE Organization, and on CS-3's personal observations.

b.       CS-3 has known BARRY WARE and GARY McDONALD since at least 1996. CS-3 admitted that in 1996, between February 2004 and June 2004, and between May 2006 and July 2007, WARE sold wholesale quantities of cocaine and crack cocaine to CS-3. CS-3 resold the cocaine and crack cocaine in smaller quantities to customers in the Joliet area.

12.    Confidential Source 4 ("CS-4")

a.       CS-4 has been providing credible information to the FBI since approximately September 2007. CS-4 has approximately ten convictions, including a 2005 conviction for manufacture/distribution of a controlled substance, 1999 and 1995 convictions for manufacture/delivery of a controlled substance, and a 1992 conviction for unlawful use of a weapon. To date, the JPD has paid CS-4 approximately $500 for his/her cooperation, which has consisted of a controlled purchase of crack cocaine from WARE Organization member KEVIN WADDELL. CS-4 identified a photograph The information CS-4 provided is based on CS-4's conversations with WADDELL and other members of the WARE Organization, and on CS-4's personal observations.

b.       CS-4 has known KEVIN WADDELL for at least twenty years, and considers WADDELL to be life-long friend. CS-4 admitted that during that time period, WADDELL sold CS-4 wholesale quantities of crack cocaine. CS-4 admitted to reselling the crack cocaine in the Joliet area.

13.    Confidential Source 5 ("CS-5")

a.       CS-5 has been providing credible information to the FBI since September 2007. CS-5 has no known arrests or convictions. To date, the FBI has paid CS-5 $1,000 for his/her cooperation, which has consisted of a controlled purchase of crack cocaine from WARE

Organization member DEVON TYLER. The information CS-5 provided is based on CS-5's conversations with TYLER and other members of the WARE Organization, and on CS-5's personal observations.

        b.       CS-5 has known TYLER for approximately two years, and considers TYLER to be a social acquaintance. CS-5 admitted that during that time period, TYLER sold CS-5 quantities of crack cocaine in amounts up to an ounce three to five times.

       14.     Confidential Source 6 ("CS-6")

        a.       CS-6 provided credible information to the FBI regarding GARY McDONALD in November 2007. CS-6 was cooperating with the FBI in hopes of receiving a reduced sentence on state drug charges. CS-6 has been arrested on numerous occasions, most recently in late 2007 on additional state drug charges. CS-6 has several convictions, including a 1996 and 1993 convictions for burglary and a 1996 conviction for robbery. The CS's cooperation consisted of a controlled purchase of crack cocaine from McDONALD. The information CS-6 provided is based on CS-6's conversations with McDONALD and other members of the WARE Organization, and on CS-6's personal observations.

        b.       CS-6 met McDONALD in 2007 and identified him by the nickname "Worm". CS-6 subsequently identified a known photograph of McDONALD as the person he knows as "Worm". CS-6 admitted that McDONALD subsequently offered to sell crack cocaine to CS-6.

**B.    The Wiretap Investigation**

       15.     From April 2006 through June 2006 and in October 2006, the FBI obtained court authorization to intercept and did intercept certain wire communications over telephones used by BARRY WARE, including:

        a.     **Target Telephone Four**. On April 16, 2007, and October 1, 2007, Chief

Judge James F. Holderman entered an order authorizing the interception of wire communications to and from a cellular telephone assigned telephone number (815) 823-6171 and direct connect number 109*240420*26, bearing ESN 000805141774330, subscribed to by Individual F, 107 Barr Elm Avenue, Joliet, Illinois, operated on the network of service provider Sprint Nextel, and used by BARRY WARE (hereinafter "Target Telephone Four").

        b.    **Target Telephone Five.**  On June 1, 2007, Acting Chief Judge Elaine E. Bucklo entered an order authorizing the interception of wire communications to and from a cellular telephone assigned telephone number (815) 260-9831, subscribed to by Individual G, 1028 Gardner Street, Joliet, Illinois 60433-2713, bearing ESN 02715342765, operated on the network of service provider U.S. Cellular, and used by BARRY WARE (hereinafter "Target Telephone Five").

        16.    In many of the intercepted and consensually recorded calls, coded language was used to conceal the true nature of the telephone calls.  At various points in this Affidavit, I have placed in brackets or parenthesis my understanding of what was being said during these calls.  My understanding is based upon the contents and contexts of the conversations, my experience as a law enforcement officer, the experience of other law enforcement agents and officers in this investigation, and information provided by cooperating sources.  The times listed for these calls are approximate.  Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of the intercepted conversations.  They do not represent finalized transcripts and may not represent the entire conversation that occurred between the identified individuals.

    **C.**    **Surveillance**

        17.    During the course of the investigation, law enforcement officers have surveilled the conduct of co-conspirators in and around the Joliet area, as well as other areas in the greater Chicago

area, including mostly suburbs south of Chicago.

**D.    Seizures**

18.    The investigation has resulted in the seizure of narcotics more throughly detailed in

Section IV:

a.    January 26, 2007 seizure of approximately 2 1/4 ounces of crack cocaine from

BARRY WARE;

b.    February 1, 2007 seizure of approximately 2 1/4 ounces of crack cocaine from

BARRY WARE;

c.    June 3, 2007 seizure of approximately one kilogram of cocaine from

GREGORIO RODRIGUEZ;

d.    September 13, 2007 seizure of approximately 2 1/4 ounces of cocaine from

BARRY WARE;

e.    September 13, 2007 seizure of approximately 2 1/4 ounces of crack cocaine

from KEVIN WADDELL;

f.    October 7, 2007 seizure of approximately 4 ½ ounces of crack cocaine from

BOBBY MITCHELL;

g.    October 18, 2007 seizure of approximately 2 1/4 ounces of crack cocaine from

DEVON TYLER; and

h.    November 8, 2007 seizure of approximately 2 1/4 ounces of cocaine from

GARY MCDONALD.

11

## IV.    PROBABLE CAUSE FOR REQUESTED COMPLAINT

### A.    Historical Information from CS-1 Regarding the WARE Organization.

19.    According to CS-1, the WARE Organization is a close-knit group made up of BARRY WARE[2] and long-time friends from a neighborhood in Joliet known as "the Hill". CS-1 explained that the WARE Organization distributes wholesale quantities of cocaine and crack cocaine in the Joliet area. CS-1 identified WARE as the leader of the WARE Organization. CS-1 identified a known photograph of WARE as the person CS-1 knows as BARRY WARE.

20.    CS-1 explained that upon his/her release from prison in 2006, CS-1 began socializing with GARY McDONALD.[3] CS-1 identified a known photograph of McDONALD as the person knows as GARY McDONALD. According to information McDONALD provided to CS-1, between

---

[2]The identification of BARRY WARE in this Affidavit is based on the following information. First, CS-1, CS-2, and CS-3 have identified WARE from a known photograph. Second, law enforcement has been able to identify WARE's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; WARE was identified or identified himself in many of those calls by name; the voice was consistently associated with the same phone numbers, particularly Target Telephone Four and Target Telephone Five; and during particular intercepted calls, WARE arranged to personally meet with other co-conspirators and those meetings were surveilled by law enforcement. Third, law enforcement has identified WARE during surveillance.

[3]The identification of GARY McDONALD in this Affidavit is based on the following information. First, CS-1, CS-2, CS-3, and CS-6 have identified McDONALD from a known photograph McDONALD. Second, law enforcement has been able to identify McDONALD's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; McDONALD was identified or identified himself in many of those calls by name or with the same alias name "Worm"; and law enforcement officers familiar with McDONALD's voice have identified McDONALD's voice on certain intercepted calls. More specifically, in 2006 JPD officers spoke to McDONALD in connection with an unrelated investigation. During that interview, McDONALD identified himself as GARY McDONALD. The same JPD officers have listened to intercepted calls on Target Telephone Four and Target Telephone Five involving McDONALD and identified McDONALD as one of the speakers in those calls.

12

the Summer of 2006 and November 2006, WARE sold McDONALD 4 ½ ounces of cocaine at least once a week. McDONALD told CS-1 that WARE "fronted" the cocaine to McDONALD, meaning that McDONALD paid WARE for the cocaine after McDONALD sold it to his customers. McDONALD told CS-1 that he paid WARE approximately $2,800 for 4 ½ ounces of cocaine. CS-1 assisted McDONALD with selling the cocaine McDONALD received from WARE.

21.    According to CS-1, in August 2006, McDONALD approached WARE and asked WARE to supply CS-1 with cocaine. WARE agreed to do so. CS-1 admitted that between August 2006 and November 2006, WARE fronted 4 ½ ounces of cocaine to CS-1 every week. CS-1 resold the cocaine in smaller quantities to customers in the Joliet area. During that same period of time, CS-1 also brokered multiple transactions, each of which involved 2 1/4 ounces of cocaine, with a female customer of the CS-1.

22.    According to CS-1, BARRY WARE stores narcotics at several homes in the Joliet area. CS-1 stated that WARE has approximately seven vehicles that workers for the WARE Organization drive to make deliveries of narcotics and pick up narcotics proceeds. CS-1 identified those vehicles to include: a silver Dodge Charger, a tan Buick, a green Cadillac, a burgundy Cadillac, and a blue Chevrolet Avalanche. As set forth in great detail below, during the course of the investigation law enforcement has observed those vehicles at locations where members of the WARE Organization met with one another to distribute narcotics or to collect narcotics proceeds.

23.    According to CS-1, a number of individuals, including MELVIN HOLMES[4] and

---

[4]The identification of MELVIN HOLMES in this Affidavit is based on the following information. First, CS-1 has identified HOLMES from a known photograph of HOLMES. Second, law enforcement has been able to identify HOLMES's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five;

KEVIN WADDELL[5], work for the WARE Organization by distributing narcotics to customers of the WARE Organization and collecting narcotics proceeds from those customers. CS-1 identified known photographs of HOLMES and WADDELL as the people CS-1 knows as MELVIN HOLMES and KEVIN WADDELL, respectively. CS-1 identified HOLMES as one of WARE's "primary" workers. CS-1 further identified WADDELL as a person who distributes crack cocaine on behalf of the WARE Organization.

24.    In February 2007, CS-1 informed agents that Target Telephone Four was WARE's new phone number.

---

HOLMES was identified or identified himself in many of those calls by name; during particular intercepted calls, BARRY WARE arranged to have co-conspirators personally meet with HOLMES and those meetings were surveilled by law enforcement; and law enforcement officers familiar with HOLMES's voice have identified HOLMES's voice on certain intercepted calls. More specifically, on December 26, 2005, JPD officers arrested HOLMES on a charge unrelated to this investigation. During that arrest, the JPD officers had an opportunity to hear HOLMES speak. The same JPD officers have listened to intercepted calls on Target Telephone Four and Target Telephone Five involving HOLMES and identified HOLMES as one of the speakers in those calls.

[5]The identification of KEVIN WADDELL in this Affidavit is based on the following information. First, CS-4 has identified WADDELL from a known photograph of WADDELL. Second, law enforcement has been able to identify WADDELL's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; WADDELL was identified or identified himself in many of those calls by name or by the same alias names, including "KK" and "Benny"; and law enforcement officers familiar with WADDELL's voice have identified WADDELL's voice on certain intercepted calls. More specifically, in 2004 and 2005, JPD officers detailed to a community policing assignment frequently interacted with WADDELL. As a result of that contact, JPD officers became familiar with WADDELL's voice, and learned that other referred to WADDELL by the nickname "KK". The same JPD officers have listened to intercepted calls on Target Telephone Four and Target Telephone Five involving WADDELL and identified WADDELL as one of the speakers in those calls.

14

**B.      Historical Information From CS-2 Regarding the WARE Organization.**

25.      According to CS-2, BARRY WARE is the leader of the WARE Organization, which CS-2 explained distributes wholesale quantities of cocaine and crack cocaine in Joliet. CS-2 identified individuals, including GARY McDONALD, as a worker for the WARE Organization. CS-2 identified a known photograph of McDONALD as the person CS-2 knows as GARY McDONALD. CS-2 identified Individual HH as customer of the WARE Organization. CS-2 explained that he/she has spoken to Individual HH on a weekly basis since 2004. CS-2 stated that between 2004 and November 2007, WARE fronted Individual HH approximately 2 1/4 to 4 1/2 ounces of crack cocaine every week. CS-2 identified Individual HH as an "enforcer", who protects the WARE Organization and its drug trafficking activities. CS-2 explained that WARE has sold Individual HH crack cocaine at a discount to account for Individual HH's services as an enforcer.

**C.      Historical Information From CS-3 Regarding the WARE Organization.**

26.      According to CS-3, BARRY WARE is the leader of the WARE Organization, which CS-3 explained distributes wholesale quantities of cocaine and crack cocaine in Joliet. CS-3 identified a known photograph of WARE as the person CS-3 knows as BARRY WARE. Between August 2003 and February 2004, GARY McDONALD sold "eight ball" (1/8 ounce) quantities of cocaine to CS-3 every day. CS-3 identified a known photograph of McDONALD as the person CS-3 knows as GARY McDONALD. Between February 2004 and CS-3's arrest in June 2004, WARE fronted wholesale quantities of cocaine, ranging from one ounce to 4 1/2 ounces, to CS-3 every few days. CS-3 stated that immediately upon his/her release from custody in May 2006, WARE gave CS-3 five hundred dollars and a cellular telephone. CS-3 stated that WARE subsequently fronted 2 1/4 ounces of cocaine to CS-3. CS-3 bagged up the cocaine into smaller quantities and fronted the

15

entire quantity to another individual. CS-3 stated that by August 2006, WARE was providing CS-3

with 3/8 kilogram of cocaine every week, 1/4 kilogram of cocaine was usually fronted to him by

WARE. CS-3 stated that by October 2006, WARE sold ½ kilogram of cocaine to CS-3 every week.

CS-3 explained that WARE continued to provide CS-3 with ½ kilogram of cocaine approximately

every week until CS-3's arrest in July 2007.

27.    According to CS-3, during the time period that CS-3 purchased cocaine and crack

cocaine from WARE, CS-3 knew WARE to also sell wholesale quantities of cocaine to GERALD

LINDSEY.[6]  CS-3 identified a known photograph of LINDSEY as the person CS-3 knows as

GERALD LINDSEY. CS-3 stated that WARE cooks the cocaine into crack cocaine at LINDSEY's

home on behalf of LINDSEY.    CS-3 identified 910 Cora Street in Joliet, Illinois as LINDSEY's

residence (hereinafter "LINDSEY's residence").  Illinois Secretary of State records identifies

LINDSEY's address as 910 Cora Street in Joliet.

**D.    January 26, 2007 Controlled Buy of 2 1/4 Ounces of Crack Cocaine from BARRY WARE.**

28.    Prior to January 26, 2007, at the direction of the FBI, CS-1 had a series of unrecorded

conversations with BARRY WARE regarding CS-1's interest in purchasing 2 1/4 ounces of crack

---

[6]The identification of GERALD LINDSEY in this Affidavit is based on the following information. First, CS-3 has identified LINDSEY from a known photograph of LINDSEY. Second, law enforcement has been able to identify LINDSEY's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; LINDSEY was identified or identified himself in many of those calls by name or the same alias name "Big Gerald"; and law enforcement officers familiar with LINDSEY's voice have identified LINDSEY's voice on certain intercepted calls. More specifically, in January 2008, JPD officers executed a search warrant at LINDSEY's residence. During the execution of the warrant, the JPD officers had an opportunity to hear LINDSEY speak. The same JPD officers have listened to intercepted calls on Target Telephone Four and Target Telephone Five involving LINDSEY and identified LINDSEY as one of the speakers in those calls.

cocaine from WARE for $1,200.

29.     On or about January 26, 2007 at approximately 1:11 p.m., CS-1 made a consensually recorded phone call to WARE at (815) 823-3782.[7] CS-1 spoke to WARE, and asked WARE to call CS-1 back. Shortly thereafter, CS-1 had a series of consensually recorded conversations with WARE at telephone numbers (815) 823-3782 and (815) 541-5638 to speak with CS-1 during these conversations. During these conversations, CS-1 explained to WARE that CS-1 had the money for the crack cocaine transaction. WARE explained to CS-1 that the transaction would occur soon.

30.     At approximately 2:23 p.m., CS-1 received an incoming call from WARE, who was using telephone number (815) 541-5638. During the conversation, which was consensually recorded, WARE and CS-1 agreed to meet at the Pit Stop Car Wash. WARE told CS-1 that he was en route to that location.

31.     Agents subsequently searched CS-1 and CS-1's vehicle for the presence of drugs, money or other contraband, with negative results. Agents also outfitted CS-1 with a body-recording device. Agents then provided CS-1 with $1,200 in United States Currency for the purpose of buying 2 1/4 ounces of crack cocaine from WARE. At approximately 2:29 p.m., agents surveilled CS-1 as CS-1 drove to the Pit Stop Car Wash located at located at 1610 S. Chicago in Joliet, Illinois, where CS-1 arrived at approximately 2:31 p.m. CS-1 parked CS-1's vehicle in the car wash bay. CS-1 remained with his/her vehicle in the car wash bay.

32.     At approximately 2:51 p.m., agents observed WARE arrive at the Pit Stop Car Wash

---

[7]Every time CS-1 placed a telephone call to discuss a narcotics transaction, law enforcement officers witnessed the numbers that CS-1 dialed as the telephone calls were placed. For incoming calls to CS-1, law enforcement observed the caller id function on CS-1's telephone prior to CS-1 answering the telephone call.

driving a gray Dodge Charger (hereinafter "the Charger"), bearing Illinois license plate 919 6972. Illinois Secretary of State records indicate that the Charger is registered to Individual A at 855 Mulford Lane, Joliet, Illinois. Agents observed WARE exit the Charger and walk toward the car wash bay, where CS-1 had parked CS-1's vehicle. At approximately 2:53 p.m., agents observed WARE return to the Charger from the car wash bay. Agents next saw WARE enter the Charger and leave the area. Shortly thereafter, agents saw CS-1 leave the area in CS-1's vehicle. Agents maintained surveillance of CS-1 in CS-1's vehicle as it drove to a prearranged meet location.

33.     At the prearranged meet location, CS-1 provided agents with a brown paper bag containing a plastic bag with an off-white chunky substance believed to be crack cocaine. Agents then searched CS-1 and CS-1's vehicle for the presence of drugs, money or other contraband, with negative results. Agents also retrieved the digital recording device from CS-1. Agents then debriefed CS-1, who explained that WARE distributed the suspected crack cocaine to him/her inside of the car wash bay at the Pit Stop Car Wash.

34.     The Drug Enforcement Administration (hereinafter "DEA") North Central Laboratory analyzed the suspected crack cocaine, and found it to be 62.4 grams of mixtures and substances containing cocaine base. The substance also contained sodium bicarbonate. Based on my training and experience as a FBI Special Agent and the experience of other law enforcement agents and officers, I believe that the cocaine base WARE sold to CS-1 on January 26, 2007 is the form of crack cocaine.

**E.    February 1, 2007 Controlled Buy of 2 1/4 Ounces of Crack Cocaine from BARRY WARE.**

35.    Prior to February 1, 2007, at the direction of the FBI, CS-1 had a series of unrecorded conversations with BARRY WARE regarding CS-1's interest in purchasing 2 1/4 ounces of crack cocaine from WARE for $1,200.

36.    On or about February 1, 2007, at approximately 12:42 p.m., CS-1 made a consensually recorded phone call to WARE at (815) 302-3146. CS-1 spoke to WARE, and asked WARE to call CS-1 back. Shortly thereafter, WARE called CS-1 using (815) 531-5638. During the conversation, which was consensually recorded, CS-1 told WARE that he/she had the money for the crack cocaine transaction. WARE told CS-1 that he would call CS-1 back. At approximately 12:52 p.m., CS-1 called WARE on (815) 302-3146. During the conversation, which was recorded, CS-1 asked WARE about the status of the transaction. WARE asked CS-1 to meet him at the Food 4 Less grocery store.

37.    Agents subsequently searched CS-1 and CS-1's vehicle for the presence of drugs, money or other contraband, with negative results. Agents also outfitted CS-1 with a body-recording device and a transmitter. Agents then provided CS-1 with $1,200 in United States Currency. At approximately 1:08 p.m., agents surveilled CS-1 as CS-1 drove to the Food 4 Less grocery store located at 1701 N. Larkin Road, Crest Hill, Illinois, where CS-1 arrived at approximately 1:29 p.m. CS-1 parked CS-1's vehicle in the parking lot near the Food 4 Less grocery store. Agents saw CS-1 remain inside of his/her vehicle.

38.    At approximately 1:45 p.m., agents observed WARE walk toward and enter the front passenger seat of CS-1's vehicle. At approximately 1:47 p.m., agents saw WARE exit CS-1's

vehicle, and walk to a Buick Park Avenue, Illinois license plate 879 1323 (hereinafter "the Buick").

Illinois Secretary of State records indicate that the Buick is registered to WARE at 312 Union Street,

Joliet, Illinois. Agents saw WARE enter the Buick and drive away from the area. Shortly thereafter,

agents saw CS-1 leave the area in CS-1's vehicle. Agents maintained surveillance of CS-1 in CS-1's

vehicle as it drove to a prearranged meet location.

39.    At the prearranged meet location, CS-1 provided agents with a small clear plastic bag

containing a chunk of an off-white rock-like substance believed to be crack cocaine. Agents then

searched CS-1 and CS-1's vehicle for the presence of drugs, money or other contraband, with

negative results. Agents also retrieved the digital recording device and transmitter from CS-1.

Agents then debriefed CS-1, who explained that WARE distributed the plastic bag containing the

suspect crack cocaine to him/her inside of CS-1's vehicle in the parking near the Food 4 Less grocery

store.

40.    The DEA North Central Laboratory analyzed the suspected crack cocaine, and found

it to be 63.9 grams of mixtures and substances containing cocaine base. The substance also

contained sodium bicarbonate. Based on my experience as a FBI Special Agent and the experience

of other law enforcement officers and agents, I believe that the cocaine base WARE sold to CS-1 on

February 1, 2007 is the form of crack cocaine.

### F.    April 18, 2007 Efforts to Obtain Cocaine for the WARE Organization Involving BARRY WARE, GARY McDONALD, and DEVON TYLER.

41.    On or about April 18, 2007, at approximately 2:52 p.m., BARRY WARE received

an incoming call on Target Telephone Four from GARY McDONALD (call # 264). During the call,

McDONALD said that his "little cutty" (cocaine customer) was with him. WARE asked

McDONALD if he had "got[ten] ready again, go half so we can get something cheaper [split the cost

of a kilogram of cocaine so that they can take advantage of a lower price]." McDONALD stated,

"Nah, cuz I just did that, I just put my shit together last night." I believe McDONALD was telling

WARE that he bought cocaine the previous evening. WARE stated that he wasn't really ready yet

anyway but he was going to be ready. WARE then told McDONALD to tell McDONALD's "little

cutty" (cocaine customer) that if WARE was going to "do something [get a supply of cocaine]"

WARE would "put him in on it [include him in on the deal]."

42. At approximately 2:59 p.m., BARRY WARE received an incoming call on Target

Telephone Four from GARY McDONALD (call # 265). McDONALD told WARE that he should

call DEVON [TYLER][8] and that WARE and TYLER should go "half and half [split the cost] on a

b [kilogram of cocaine] from that dude [the cocaine supplier]. WARE told McDONALD that he

would "holler at [call] him."

43. At approximately 5:36 p.m., BARRY WARE received an incoming call on Target

Telephone Four from GARY McDONALD (call #294). McDONALD asked WARE if he talked to

"DEVON" (TYLER). WARE stated that he had not talked to him. WARE stated, "When I talked

to DEVON [TYLER] last, he was waiting on the Julio [a Hispanic cocaine supplier] to call him."

---

[8]The identification of DEVON TYLER in this Affidavit is based on the following
information. First, CS-5 has identified TYLER from a known photograph of TYLER. Second,
law enforcement has been able to identify TYLER's voice because: that voice has been
intercepted numerous times on Target Telephone Four and Target Telephone Five; TYLER was
identified or identified himself in many of those calls by name; and law enforcement officers
familiar with TYLER's voice has identified TYLER's voice on certain intercepted calls. More
specifically, in May 2007, a JPD officer arrested TYLER on a charge unrelated to this
investigation. During that arrest, the JPD officer had an opportunity to hear TYLER speak. The
same JPD officer has listened to intercepted calls on Target Telephone Four and Target
Telephone Five involving TYLER and identified TYLER as one of the speakers in those calls.

WARE then stated, "I guess what you got was straight [the cocaine was of good quality] with DEVON [TYLER]. DEVON [TYLER] went somewhere and got something for us [members of the WARE Organization] one time that was some straight bullshit [the cocaine was of poor quality] and I was kind of scared to mess with him." McDONALD and WARE discussed other potential sources of cocaine, including Individual H and Individual I. WARE reiterated that he was "going to try to make something happen [obtain a supply of cocaine]."

G.   **April 18, 2007 and April 20, 2007 Calls Between BARRY WARE and JERMAINE McCANN Regarding the Distribution of Crack Cocaine.**

44.   On or about April 18, 2007, at approximately 12:54 p.m., BARRY WARE received an incoming call on Target Telephone Four from JERMAINE McCANN[9] (call #238). McCANN told WARE that "dude" (McCANN's customer) wanted that "twenty-four [2 1/4 ounce quantity] again." WARE asked McCANN if "he" (McCANN's customer) wanted it "hizzard" (in the form of crack cocaine). McCANN told WARE that "he" (McCANN's customer) did. WARE told McCANN to call him when "dude" (McCANN's customer) was ready.

---

[9]The identification of JERMAINE McCANN in this Affidavit is based on the following. First, law enforcement identified McCANN during surveillance. Second, law enforcement has been able to identify McCANN's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; McCANN was identified or identified himself in many of those calls by name; during particular intercepted calls, McCANN arranged to personally meet with co-conspirators and those meetings were surveilled by law enforcement; and a law enforcement officer familiar with McCANN's voice has identified McCANN's voice on certain intercepted calls. More specifically, in 2001 and 2002, a JPD officer assigned to a neighborhood police unit had frequent contact with McCANN, and therefore became with McCANN's voice. The same JPD officer has listened to intercepted calls on Target Telephone Four and Target Telephone Five involving McCANN and identified McCANN as one of the speakers in those calls.

45.     On or about April 20, 2007, at approximately 8:50 p.m., BARRY WARE, using Target Telephone Four, received a call from JERMAINE McCANN, who called from telephone number (815) 651-9780 (call #764). During the call, McCANN told WARE that he needed "that, uh, that two and a, uh, you know" (2 1/4 ounces of cocaine). McCANN asked WARE if he wanted to call McCANN back using WARE's other phone. WARE said he did. Telephone records reveal that at approximately 8:59 p.m., an outgoing call was placed from Target Telephone Five to (815) 651-9780. Based on my involvement in this investigation and the pen register data and wire interception of calls to and from Target Telephone Four, I believe that McCANN was asking BARRY WARE to call him back using Target Telephone Five rather than Target Telephone Four in an effort to avoid detection by law enforcement.

**H.     April 19, 2007 and April 21, 2007 Calls Involving BARRY WARE, BOBBY MITCHELL, and MELVIN HOLMES Regarding the Distribution of Cocaine.**

46.     On or about April 19, 2007, at approximately 8:30 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to BOBBY MITCHELL[10] (call #514). WARE asked,

---

[10]The identification of BOBBY MITCHELL in this Affidavit is based on the following. First, law enforcement identified MITCHELL during surveillance. Second, MITCHELL identified himself to law enforcement during a traffic stop of MITCHELL on October 6, 2007. Third, law enforcement has been able to identify MITCHELL's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; MITCHELL was identified or identified himself in many of those calls by name or by the nickname "Mitch"; during particular intercepted calls, MITCHELL arranged to have co-conspirators personally meet with MITCHELL and those meetings were surveilled by law enforcement; and law enforcement officers familiar with MITCHELL's voice have identified MITCHELL's voice on certain intercepted calls. More specifically, in 2004 and 2005, a JPD officer assigned to a neighborhood police unit had several interactions with MITCHELL. As a result, the JPD officer became familiar with MITCHELL's voice, which the officer noted was distinct. The JPD officer has listened to intercepted calls on Target Telephone Four and Target Telephone Five involving MITCHELL and identified MITCHELL as one of the speakers in those calls.

"What's going on with you Mitch?" MITCHELL stated that he was on the West Side [of Joliet] "doing the damn thing [selling cocaine]." WARE stated, "I was seeing how things looking for you and seeing if I need to get you ready [to receive more cocaine from WARE]." MITCHELL stated, "Well, I'll tell you better tomorrow. Friday is always my best day [for cocaine sales]." WARE told MITCHELL to "try to just do all of that and I'll get you another one [supply of cocaine]. Try to finish it up. It ain't no big deal if you don't do it, though." MITCHELL stated, "Oh, I'll finish it up [selling the cocaine MITCHELL had]. No doubt." Ware asked, "Are you close to that number?" MITCHELL then stated, "tomorrow I'll probably be over the fifteen mark [$1,500], probably by tomorrow evening." WARE stated, "That's cool." MITCHELL then asked, "Do you want me to call you so we can swap it up [exchange money for more cocaine]?" WARE told MITCHELL, "Yeah, no, just keep going [selling cocaine]." MITCHELL stated, "Alright."

47.    On or about April 21, 2007, at approximately 11:27 a.m., BARRY WARE placed an outgoing call to BOBBY MITCHELL on Target Telephone Four (call #846). WARE asked MITCHELL, "Why ain't you been keeping your phone with you BOBBY?" MITCHELL replied, "Cause I ain't ready [for more cocaine]. I'm like twenty-two [$2,200] now dog." WARE told MITCHELL, "I ain't worried about that Bobby. You ain't going nowhere and you always pay me. I got a lick for you. I'm fittin' to have you do something [receive more cocaine]." MITCHELL stated, "Well, okay then. Let's do it." WARE told MITCHELL to "take the deuce-deuce [$2,200] over there, on over to MELVIN [HOLMES]'s house, and get that [quantity of cocaine] and just add it to, just put it on the other end." Illinois Secretary of State records and surveillance reflect that HOLMES resides at 211 N. Broadway Street in Joliet, Illinois (hereinafter "HOLMES's residence"). MITCHELL stated, "Okay, then. That's what I'm talking about." WARE stated that, "He

24

[HOLMES] over there waiting on you now. Now, go grab that, keep on going [selling cocaine] and hit me with the other deuce later on [pay WARE another $2,000 after MITCHELL sells the cocaine]." MITCHELL stated, "Alright."

48.     At approximately 11:46 a.m., WARE received an incoming call on Target Telephone Four from MITCHELL (call #848). WARE stated, "What's up Mitch?" MITCHELL stated, "Hey, I'm standing on the porch [of MELVIN HOLMES's residence]. Hey, what about that little short piece [a smaller quantity of cocaine]? You want to wait until next time or something or what?" WARE asked, "How much [cocaine] do I owe you?" MITCHELL stated, "I forgot what it was. It wasn't nothing but a couple of little things [smaller quantities of cocaine]. I think he [HOLMES] would know. Oh, he [HOLMES] at the door now." WARE stated, "Okay." Based on the foregoing, I believe that WARE distributed cocaine to MITCHELL via HOLMES.

**I.      April 26, 2007 Calls and Surveillance of BARRY WARE's Distribution of Crack Cocaine to JERMAINE McCANN.**

49.     On or about April 26, 2007, at approximately 8:36 p.m., BARRY WARE received an incoming call on Target Telephone Four from JERMAINE McCANN (call #1682). McCANN stated that people wanted to know if any of WARE's "stuff" (cocaine) was "tissue" (powder cocaine). WARE stated "no". I believe that WARE was in possession of crack cocaine rather than powder cocaine. WARE then expressed discomfort that McCANN had WARE riding around with the "shit" (the crack cocaine) on WARE. McCANN asked if he could have "half of it" (the crack cocaine). WARE stated that he was not "going into it like that." I believe that WARE was telling McCANN that he was unwilling to sell McCANN half of the crack cocaine rather than the full quantity.

25

50.    At approximately 8:47 p.m., law enforcement observed McCANN, driving a Silver Mitsubishi Diamante bearing Illinois registration 8762397 (hereinafter "the Mitsubishi"), arrive at 815 Motoring Custom Wheels, a rim shop located at 2216A W. Jefferson Street in Joliet, Illinois. Illinois Secretary of State records reflect that the Mitsubishi is registered to Individual V at 508 Bethel Drive, Apartment 1S, Joliet, Illinois. At around this same time, law enforcement saw WARE arrive at that same location driving a maroon Cadillac Deville, bearing Illinois registration 7635760 (hereinafter "the Deville"). Illinois Secretary of State records reflect the Deville is registered to Individual W at 209 Sherry Lane, Joliet, Illinois. Law enforcement observed McCANN exit the Mitsubishi, walk to WARE's Cadillac, and enter it. After approximately one minute, JPD officers observed McCANN exit WARE's Cadillac and reenter his Mitsubishi. McCANN then left the area. Based on the foregoing, I believe that WARE distributed McCANN distributed crack cocaine inside of WARE's Cadillac.

51.    At approximately 9:31 p.m., BARRY WARE received a call from JERMAINE McCANN on Target Telephone Four (call #1692). WARE told McCANN to "take it [proceeds from the crack cocaine McCANN received from WARE and sold to another person] and give it to [Individual A]." McCANN told WARE that he didn't want to do that and that the "dude" (McCANN's crack cocaine customer) was short $100, that McCANN only received $1,100. I know that in April 2007, $1,200 was consistent with the price for 2 1/4 ounces of crack cocaine. WARE called McCANN a liar and told him to give the money to Individual A. McCANN then asked if he could get "some more [crack cocaine] tomorrow." WARE again told McCANN again to bring the money to Individual A.

**J.**    **April 27, 2007 and April 28, 2007 Calls Involving BARRY WARE, BOBBY MITCHELL, and MELVIN HOLMES Regarding the Distribution of Cocaine.**

52.    On or about April 27, 2007, at approximately 5:09 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to BOBBY MITCHELL (call #1814). WARE asked, "Bob, where your phone at man?" MITCHELL stated, "Oh, I got the motherfucker sittin' over here in the drawer man." WARE asked, "What you been doin man? I ain't heard from you." MITCHELL stated, "Nigger, I'm damn near there [finished selling the cocaine WARE supplied to him]. WARE stated, "I know you is. That's why I called you." MITCHELL told WARE, "Just give me a minute. I'm damn near there. I was tryin' to hit you before the first [May 1, 2007]. I was tryin' to fix this [sell all of the cocaine] before the first [of the month] so I could have a new lick [obtain a new supply of cocaine from WARE], you know. I got you man. Don't worry. I was gonna call anyway." WARE stated, "Alright."

53.    On or about April 28, 2007, at approximately 9:29 a.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #1906). During the call, MITCHELL told WARE, "Listen, I'm about four ($400) short, which I should have tonight, considering today's Friday. I mean, today is Saturday. So, you have me ready, whatever happens, I'll pick up [a supply of cocaine] Sunday. If you need that, I got that, like twenty-two [$2,200] for you, you know." WARE replied, "Yeah, I'm gonna need it to get you something. I'm probably gonna need it. I'm fittin' to go get you something [a supply of cocaine] right quick so I'll be ready for you when you get done." MITCHELL stated, "Alright."

54.    At approximately 9:30 a.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #1907). MITCHELL asked, "Hey, you still don't

27

have that little piece [smaller quantity of cocaine] for me yet?" WARE stated, "Yeah, I'll get it for you. I'll put it in there for you. I'll bring it when I come do that thing [supply MITCHELL with additional cocaine]."

55.    At approximately 12:58 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to BOBBY MITCHELL (call #1950). WARE asked MITCHELL where he was. MITCHELL stated, "I'm over by Lake Village. I'm fittin' to grab my kids right quick and come that way. Just tell me what you need. I mean, cause all I'm fittin' to do is go up there and grab them and bring them over there." WARE asked, "Where is that Bobby?" MITCHELL stated, "Lake Village? Lake Village, brother, over by Black Road. Larkin Village. WARE stated, "On Black Road? Larkin Village? You called it Lake Village." MITCHELL stated, "All that shit the same. It's just some projects. What? Soon as I swing through there. If you want me to, I swing through maybe somebody's house with that [narcotics proceeds] if you want me to." WARE tells MITCHELL "probably go over to MELVIN [HOLMES]'s house." MITCHELL replied, "I can go over to MELVIN's. Is he gonna have the thang [supply of crack cocaine] ready for me?" WARE stated, "He's gonna have it ready for you. He's gonna have a nice little demo [quantity of cocaine] ready for you." MITCHELL stated, "Okay then. So, okay I'm gonna drop in this here then [deliver the narcotics proceeds to HOLMES]. Hey, probably, instead of me just letting it get larged up [amassing a large amount of narcotics proceeds] by tomorrow night, I know by tomorrow night so I can say Sunday morning, I'm gonna call you and then I'll just get it [supply of cocaine] and you can come get that little four [$400 in narcotics proceeds], you know. That way, we'll stay even." WARE replied, "We'll stay even, that's right." MITCHELL stated, "Alright then."

56.    At approximately 1:55 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to MELVIN HOLMES (call #1958). WARE asked HOLMES, "Did BOBBY [MITCHELL] get up with you yet [to obtain additional cocaine]?" HOLMES replied, "Yeah, I'm gonna holler at old dude right fast."

**K.    April 30, 2007 - May 2, 2007  Efforts to Obtain Cocaine for the WARE Organization Involving BARRY WARE, DEVON TYLER, GERALD LINDSEY, GARY McDONALD, KEVIN WADDELL and JERMAINE McCANN.**

57.    On or about April 30, 2007, at approximately 2:44 p.m., BARRY WARE received an incoming call on Target Telephone Four from DEVON TYLER (call #414). WARE told TYLER, "Man, make some calls man [for the purpose of acquiring cocaine]." TYLER said, "Shit, I been making some [calls], what you trying to do, all the way [purchase one kilogram of cocaine]?" WARE stated, "Yeah, see what's happening on that." TYLER said, "Alright."

58.    On or about May 1, 2007, at approximately 9:34 a.m., BARRY WARE received an incoming call on Target Telephone Four from DEVON TYLER (call #430). WARE stated, "Get up D [DEVON]. You can't be sleeping. You know what today is man." TYLER stated that he was up and was eating breakfast. WARE asked, "What's up with dude [TYLER's cocaine source]? Is it too early?" TYLER stated that he was "fittin' to hit his ass [call the supplier] as soon as I get through eating." WARE stated, "Shit man, we might even get two or three of them [kilograms of cocaine]. Call me on your phone. Put some minutes on your phone."

59.    At approximately 10:28 a.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #2466).

a.    During the call, McDONALD expressed some frustration, stating, "Man." WARE stated that he was "waiting on DEVON [TYLER] to call. Only luck [to obtain cocaine] we got is DEVON [TYLER]. If DEVON [TYLER] don't come [with cocaine from his supplier] we fucked." McDONALD joked with WARE that "we all might as well move in together, split our bills up." WARE agreed that they would have to do so "if we don't get no work [cocaine to sell]. WARE stated that he hasn't seen it "fucked up like this [difficult to obtain cocaine] in a long time." McDONALD stated that somebody told him that is was "fucked up [difficult to obtain cocaine] in Michigan too." I am aware that, based on a number of factors, in 2007, there was a shortage in the wholesale cocaine supply in the Midwest, thereby making it more difficult for drug traffickers to obtain wholesale quantities of cocaine.

b.    Later during the same call, McDONALD asked WARE about "that dude [cocaine supplier] in Kankakee." WARE stated that he didn't know, noting "that's GERALD [LINDSEY] and them's dude [cocaine supplier]. We can't get to him. But I think we bought all of his [LINDSEY's] shit [cocaine]." McDONALD stated that "GERALD [LINDSEY] is on some bullshit." WARE agreed, stating that GERALD LINDSEY "is always trying to make an extra five dollars [an extra $500 profit from the sale of a kilogram of cocaine]." McDONALD stated he was going to speak to LINDSEY.

60.    At approximately 5:43 p.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #2603).

a.    During the call, WARE stated that he was waiting on "DEVON" (TYLER), who had said that "the Julio [TYLER's Hispanic cocaine supplier] was going to check on the lick [availability of cocaine] right now." WARE stated that "DEVON" (TYLER) was going to call

WARE back in about 20 minutes.  McDONALD told WARE that "GERALD" (LINDSEY) just called him and told him to see if Individual E wanted to go "down there" (Kankakee).  WARE asked what "the number [price]" was "on it [for each kilogram of cocaine]."  McDONALD stated that LINDSEY didn't tell him "the number [the price]."

      b.     Later during the same call, McDONALD told WARE that "the dude [cocaine supplier] want six [$6,000]."  WARE said, "What you just gonna grab you a quick nine [ounces of cocaine] or something?"  McDONALD said, "Yeah."  WARE said, "Yeah, gotta do something.  Hell, I'll pay six [$6,000] for some good shit [high quality cocaine]."  McDONALD said, "[Individual E] grabbing some, whatever."  I know that $6,000 is consistent with the price of 4 ½ ounces of cocaine in the Joliet area in May 2007.  WARE then said, "I don't give a fuck if it ain't no good, I'm still gonna get it [cocaine].  I don't give a fuck if it's chalk [of poor quality]."

      c.     Later during the same conversation, WARE told McDONALD that "the Hill [neighborhood in Joliet] is dry [without cocaine]."  McDONALD told WARE that he "got that little shit [smaller quantity of cocaine] that KK [KEVIN WADDELL] had."  WARE stated that he knew "KK [WADDELL] bought out [WADDELL's customers have bought him out]."  WARE stated that he was surprised that WADDELL let McDONALD "get that shit [cocaine]."  McDONALD asked WARE if WADDELL "whipped it all up [cooked cocaine into crack cocaine]."  WARE said, "Yeah, you know he did.  Hell yeah."  McDONALD asked, "Ain't nothing but salt ain't it?"  WARE said, "Umhmm.  They call, you know KK [WADDELL's] nickname?"  McDONALD said, "Soda Pop." I believe WADDELL's nickname is a reference to WADDELL's use of baking soda to cook cocaine into crack cocaine and increase the quantity of crack cocaine WADDELL is able to make given his liberal use of baking soda.  WARE said that WADDELL was still "getting that stuff off though

31

[selling a lot of crack cocaine].  Motherfucker got two motherfuckin' HEMIs."[11]

61.    At approximately 9:43 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to GERALD LINDSEY (call #2671).  WARE asked LINDSEY "what Worm [GARY McDONALD] talking about?"  LINDSEY stated, "I don't know, I was just trying to see what ya'll was trying to do [how much cocaine WARE wanted] and I was gonna grab it [buy the cocaine] for you in the morning."  WARE asked if the "dude [supplier] straight [in possession of cocaine]?"  LINDSEY stated, "Yeah, the dude I get it from.  He just too high [cocaine supplier's price is too high].  He got it."  LINDSEY then told WARE to "get [Individual E], get Worm [McDONALD] whatever, then let me know what you all gonna do and then I'll go grab it [cocaine] for you all."  WARE asked "What's the numbers [price] on it [each kilogram of cocaine]?"  The call then disconnected.

62.    On or about May 2, 2007, at approximately 10:23 a.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #2706).  McDONALD told WARE to "Get your punk ass up."  McDONALD asked if "GERALD" (LINDSEY) called WARE.  WARE said that LINDSEY asked him for Individual E's number.  McDONALD said that he was going to call LINDSEY.  WARE told McDONALD not to call him because WARE "might have somebody [a supplier prepared to sell cocaine] for twenty-two [$22,000 per kilogram of cocaine]."  WARE then said that GERALD [LINDSEY] is "talking about taxing y'all [making other members of the WARE Organization pay a little extra for the cocaine]."  WARE then stated that he wasn't "fittin' to pay no six dollars [$6,000 for 1/4 kilogram of cocaine] when I might get one [kilogram

---

[11]  A reference to a type of engine, currently used in some Dodge vehicles.  In a HEMI engine, the top of the combustion chamber is hemispherical.

of cocaine] for twenty-two [$22,000]." WARE said that "Twenty-two [$22,000 per kilogram] ain't too high. Motherfuckers payin' that now. That ain't bad. Motherfuckers still can make something [a profit] off that [kilograms bought at $22,000]." I know that $22,000 is consistent with the price of a kilogram of cocaine in Joliet, Illinois in May 2007.

63.    At approximately 12:27 p.m., WARE placed an outgoing call on Target Telephone Four to GARY McDONALD (call #2719). WARE asked McDONALD: "What [Individual J] fittin' to get from you?" McDONALD asked WARE why he was asking. WARE said that he just talked to "[Individual J]" and that he said that McDONALD "was straight [in possession of cocaine] and [Individual J] was fittin' to come talk to him [Individual J planned to obtain cocaine from McDONALD]." McDONALD stated that Individual K got something from Individual L and that McDONALD was "doing it [selling cocaine] for [Individual K]." McDONALD explained that Individual K called him last night and let him know that he had "some of them games [a quantity of cocaine] or some shit." McDONALD asked WARE "[Individual J] telling on me [possessing cocaine], huh?" WARE said, "Yeah, [Individual J] telling on you." WARE then asked how McDONALD was "running around here straight [in possession of cocaine to sell] and not telling anybody." McDONALD said that "GERALD" (LINDSEY) has been "saying the same shit of the last three or four days."

64.    At approximately 4:04 p.m., BARRY WARE received an incoming call on Target Telephone Four from JERMAINE McCANN (call #2750). McCANN asked "still dead [without cocaine to sell], huh?" WARE responded that he was going to "up the numbers too" when he "gets something." I believe that WARE was saying that he was going to increase his prices at which he sold cocaine once he was able to purchase cocaine. WARE explained "them things $13 now." I

33

believe WARE was referring to the cost of ½ kilogram as $13,000. I know that $13,000 is consistent

with the price of ½ kilogram of cocaine in the Joliet area in May 2007. McCANN told WARE that

WARE would "make a killing [make a lot of money from selling the cocaine]."

**L.      May 7, 2007 Distribution of Crack Cocaine to BOBBY MITCHELL by BARRY WARE via MELVIN HOLMES.**

65.     On or about May 7, 2007, at approximately 8:38 a.m., BARRY WARE received an

incoming call on Target Telephone Four from BOBBY MITCHELL (call #3622). MITCHELL

asked WARE if it was too early for him to call. WARE stated, "No, we all good." MITCHELL told

WARE, "Hey man, listen. If it don't be, like, today or tomorrow..." WARE interrupted MITCHELL

and stated, "It's going to be today." MITCHELL stated, "Oh, okay. I'm telling you, I'm dead on

my fucking heels [out of narcotics to sell]. I paid all my bills. I'm so broke, god dammit, I'm scared

to come outside." WARE told MITCHELL, "We gonna be working [selling narcotics] today."

MITCHELL stated, "Alright."

66.     At approximately 4:04 p.m., BARRY WARE received an incoming call on Target

Telephone Four from BOBBY MITCHELL (call #3726). WARE stated, "What's up Mitch?"

MITCHELL asked, "What's happening Jack?" WARE replied, "Nothing, I'm trying to get to you

[with additional crack cocaine] now. I just, you know, touchin' it [cooking the powder cocaine into

crack cocaine]. Let me make sure it's right. We all good, though. Don't worry about nothing. We

gonna work [sell crack cocaine] today. I told you we was." MITCHELL stated, "Alright then, dog."

67.     At approximately 6:29 p.m., BARRY WARE placed an outgoing call on Target

Telephone Four from BOBBY MITCHELL (call #3755). WARE told MITCHELL, "BOBBY, go

over to MELVIN [HOLMES]'s house [to pick up crack cocaine]." MITCHELL stated, "I'm on my

way, dog." WARE stated, "There's half [of the crack cocaine] there. I'll give you the other half [of the crack cocaine] in the morning." MITCHELL stated, "Alright."

68.    At approximately 6:30 p.m., law enforcement initiated mobile surveillance in the vicinity of MELVIN HOLMES's residence. At approximately 6:35 p.m., law enforcement observed BOBBY MITCHELL sitting in the driver seat of a Lexus sedan bearing Illinois registration 9676719 (hereinafter "the Lexus") that was parked on the block of HOLMES's residence. Illinois Secretary of State records reflect that the Lexus is registered to BOBBY MITCHELL at 812 2nd Avenue, Apartment 105, Joliet, Illinois. Law enforcement continued mobile surveillance rather than parking the surveillance vehicle in an effort to avoid detection by MITCHELL, HOLMES and other members of the WARE Organization.

69.    At approximately 6:40 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #3757). MITCHELL told WARE, "I'm out front [of MELVIN HOLMES's residence]." WARE stated, "I'm gonna call him [HOLMES] and tell him you're out there." MITCHELL stated "Alright."

70.    At approximately 6:41 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to MELVIN HOLMES (call #3758). WARE stated, "BOBBY out front MELVIN." HOLMES stated, "okay."

71.    At approximately 6:43 p.m., law enforcement observed BOBBY MITCHELL re-enter the Lexus and drive away from the area. Because law enforcement was engaged in mobile surveillance, law enforcement had not seen MITCHELL exit the Lexus or enter and exit HOLMES's residence. Based on the foregoing, I believe that BARRY WARE distributed crack cocaine to MITCHELL via HOLMES at HOLMES's residence.

**M.    May 8, 2007 Distribution of Cocaine to GARY McDONALD by BARRY WARE.**

72.    On or about May 8, 2007, at approximately 11:27 a.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #3847). During this call, McDONALD asked WARE if he had a "zip [ounce of cocaine]" that he "want to get rid of." WARE stated, "Hell yeah. Eight dollars [$800]." I know $800 to be consistent with the price of one ounce of cocaine in the Joliet area in May 2007. McDONALD asked an unidentified person if she/he had "eight dollars [$800]." McDONALD then told WARE that he had somebody that "wants [to purchase] it [the cocaine]." McDONALD told WARE that is "down by [Individual M's]." WARE said he'd "come down there [to McDONALD's location to distribute the cocaine to McDONALD's customer]."

**N.    May 8, 2007 Distribution of Cocaine to TERRY PETEN and Individual O by BARRY WARE Involving MELVIN HOLMES.**

73.    On or about May 8, 2007, at approximately 3:21 p.m., BARRY WARE received an incoming call on Target Telephone Four from TERRY PETEN[12] (call #3890). PETEN told WARE, "I'm waiting on you. I got some people [narcotics customers] just called me." WARE stated,

---

[12]The identification of TERRY PETEN in this Affidavit is based on the following. Law enforcement has been able to identify PETEN's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; and PETEN was identified or identified himself in many of those calls by the same name or aliases, including "T" and "Marv". During particular intercepted calls, co-conspirators refer to PETEN being on supervised release. Criminal history records for PETEN reflect that he was on supervised release during the interception of wire communications to and from Target Telephone Four and Target Telephone Five. During particular intercepted calls, co-conspirators and PETEN refer to "TERRY" (PETEN) working at "Greg's Auto Body". Law enforcement spoke to an employee at Greg's Auto Body Shop, who confirmed that "TERRY PETEN" worked at Greg's Auto Body shop during the interception of wire communications to and from Target Telephone Four and Target Telephone Five.

36

"Okay, I'll hit you right back. Where you at? You got to come to me [to pick up the narcotics] T, I'm real tied up." PETEN asked, "How I gonna come to you, WARE? You know I ain't got no motherfucking transportation." WARE replied, "You got to wait a minute TERRY. I got it [a supply of cocaine], but you gotta wait until I get to it then. You inconveniencing me man, all this hiding shit." PETEN stated, "Man, I can't help that man." WARE told PETEN, "Okay, then you got to wait until I can get to you TERRY. I got it over at my baby's mama's house. Fuck, I sure got it waiting for you. Let me hit you right back. I'll see if MELVIN [HOLMES] will do it for me [deliver the cocaine to PETEN]." PETEN stated, "Alright. Hey check this out. You know, do it, you know, split 'em out [repackage the cocaine in smaller quantities for resale]. You know what I'm sayin'?" WARE stated, "Okay, alright." PETEN stated, "Man, it would be a big help, WARE, you know if I could I would come to you man. But I ain't got no way man."

74.    At approximately 3:51 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to TERRY PETEN (call #3900). PETEN asked WARE, "Does [Individual N] owe you some money [from the sale of narcotics]? I can have him reach you." WARE asked, "[Individual N]? That might be okay. Let me see something right quick. He gonna have to put it together [repackage the cocaine into smaller quantities for resale] for you, T. You trust him like that?" PETEN stated, "Uh, I'm gonna have to be..." WARE interrupted and stated, "This is what I did T. I bought it [distribute the cocaine] close around so I can get it to you, right. I'm not near no clock [scale with which to weigh the cocaine] or nothing." PETEN stated, "Okay, I've got a clock [scale] with me."

75.    At approximately 4:31 p.m., WARE placed an outgoing call on Target Telephone Four to TERRY PETEN (call #3921). WARE asked, "Where dude [PETEN's customer] at

37

TERRY?" PETEN replied, "I got to call him back. He's probably close around cuz he's tryin' to come out here and I told him to hold up." WARE stated, "I'm fittin' to go buy it [a quantity of cocaine]. He gonna have to, you gonna have to put it together [package the cocaine for resale], T, and I'm gonna owe you something. Alright?" PETEN asked, "What you want me to tell him?" WARE stated, "Hold up. Let me get to it first. Let me get to it [the cocaine supply]. Tell him to be, like, over by Black Road on the West Side [of Joliet to complete the transaction]."

76.    At approximately 4:58 p.m., WARE placed an outgoing call on Target Telephone Four to TERRY PETEN (call #3928). WARE told PETEN, "It's [the cocaine] all there. It's going to be there, okay? What you got last time [the same amount of cocaine he received from WARE during their last transaction]." PETEN stated, "Alright."

77.    At approximately 5:32 p.m., WARE received an incoming call on Target Telephone Four from TERRY PETEN (call #3942). WARE asked PETEN, "Everything [all of the cocaine] there TERRY?" PETEN replied, "No it ain't." WARE stated, "Yes, it is." PETEN stated, "It's [the cocaine] fifty-one [grams] man. It's fifty-one [grams]. I got the times [weights]. It's fifty-one degrees [grams] outside." Agents noted that the actual temperature outside was approximately 80 degrees. WARE asked, "Fifty-one [grams]? Hold on. How that motherfucker [the cocaine] fifty-one [grams]? That's what it [the scale] says?" PETEN stated, "Yeah, it's fifty-one degrees [grams]." WARE stated, "TERRY, I'll hit [call] you right back. I might have gave you the wrong one [package of cocaine]."

78.    At approximately 5:33 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to Individual O (call #3943). WARE asked, "Is [Individual P] there yet?" Individual O told WARE she was not. WARE stated, "Call me as soon as she get there. Put that

thing [cocaine] on the clock [scale] and tell me how much it is [weighs]." Individual O stated, "Okay." WARE stated, "As soon as she get there [Individual O]."

79.    At approximately 5:34 p.m., BARRY WARE received an incoming call on Target Telephone Four from Individual O (call #3944). WARE asked, "What it [the scale] say?" Individual O replied, "Sixty-four - two [64.2 grams] in the bag." WARE asked "Sixty-four [grams]?" Individual O said, "Yeah." WARE told Individual O, "Don't do that [cook it the cocaine into crack cocaine] [Individual O]. Leave it. Hold up one second. Don't mess with it [the cocaine]." Individual O stated, "Okay."

80.    At approximately 5:35 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to TERRY PETEN (call #3945). WARE stated, "I gave you the wrong one [package of cocaine] T, you right." PETEN said, "Yeah." WARE stated, "Okay." PETEN asked, "Huh?" WARE repeated, "I gave you the wrong one [package of cocaine]."

81.    At approximately 5:35 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to Individual O (call #3946). WARE stated, "[Individual O], if you want to keep that [cocaine] you got to give me seventeen dollars [$1,700]. That was somebody else's [PETEN's cocaine]. I gave you the wrong one." Individual O replied, "Good lord. Okay." WARE stated, "The shit [cocaine] gone up [in price] [Individual O]. I ain't tryin' to rob you. That's how much I paid for it." I know that $1,700 is consistent with the high-end of the range at which 2 1/4 ounces were being sold for in the Joliet area in May 2007. Individual O stated, "alright." WARE stated, "It's two and a thing [2 1/4 ounces of cocaine]."

82.    At approximately 5:36 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to Individual O (call #3947). WARE stated, "Just give me sixteen [$1,600 for the

2 1/4 ounces of cocaine]. I take a hundred dollar off that. I gave you the wrong one [package of cocaine]." Just give me sixteen [$1,600]." Individual O replied, "Alright."

**O.    May 10, 2007 Calls Regarding Distribution of Cocaine Involving BARRY WARE and TERRY PETEN.**

83.    On or about May 10, 2007, at approximately 1:04 p.m., BARRY WARE received an incoming call on Target Telephone Four from TERRY PETEN (call #4301). What, you almost done [selling all of your cocaine]?" PETEN stated, "I'm working still working on it. You know, everything going, yeah. You gonna be ready [to supply PETEN with more cocaine]?" WARE stated, "Yeah. We gonna keep goin' [selling cocaine] man. I just gotta do what I gotta do. You got to give me fifteen dollars [$1,500] too Marv. I paid fifteen dollars [$1,500] for that shit [2 1/4 ounces cocaine]." PETEN asked, "Man, how I gonna get something like that?" WARE stated, "TERRY, the things is three, six, and nine [$3,000 for one 4 ½ ounce quantity of cocaine, $6,000 for two 4 ½ ounce quantities of cocaine, and $9,000 for three 4 ½ ounce quantities of cocaine]. That's why I didn't get none. I'm really just buying some [smaller quantities of cocaine] for you niggers to get some money. That's how much that shit [cocaine] costs. I ain't makin' a dime off it." I know that $3,000, $6,000, and $9,000 are consistent with the prices for one 4 ½ ounce quantity of cocaine, two 4 ½ ounce quantities of cocaine, and three 4 ½ ounce quantities of cocaine in the Joliet area in May 2007.

**P.    May 11, 2007 Call Regarding Cocaine Distribution Involving BARRY WARE and DEVON TYLER.**

84.    On or about May 11, 2007, at approximately 1:49 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to DEVON TYLER (call #719). WARE asked TYLER, if "dude [TYLER's cocaine supplier] was coming back today?" TYLER stated that he was "waiting

40

on Julio [a Hispanic cocaine supplier] to call me." WARE stated, "We gonna have to go back to the

store [obtain more cocaine from the supplier]." TYLER then said, "Hey man, you know what you

was talking about - keep grabbing, keep grabbing, keep grabbing [buying cocaine]. Shit, when I get

through this motherfucker [supply of cocaine], I'll be ready to go half-way [obtain one-half kilogram

of cocaine]." WARE stated, "You should . . . as much as we can grab. Man, you gotta keep that shit

going [keep buying and reselling cocaine] D, then before you know it you'll be all the way [obtaining

one kilogram quantities of cocaine at a time]." TYLER stated, "I was just grabbing shit. Every time

I get enough change [money] I just snatch something [more cocaine]." WARE stated, "That's the

best way to do it. Before you look up, your change [cocaine proceeds] will be built up like a

motherfucker. I'm telling you." TYLER stated, "Shit, I ain't gave it [cocaine proceeds] a chance

to build up. Cuz I just, I, every time I got something [cocaine proceeds], I spend something [buy

more cocaine]." WARE stated, "Yeah, but by the time you snatch something you already damn near

have the half with the whole. You know what I'm saying? And the change to go with it." I believe

WARE was telling TYLER that he would make enough money to pay for the ½ kilogram of cocaine

he had, buy another full kilogram, and still have money left over. TYLER then stated, "I'm waiting

on this chump [cocaine supplier] to hit [call] me though. As soon as he hit [call] me, I'm gonna call

you. You still need that two piece suit right [quantity of cocaine]?" WARE stated, "Let me see. He

[TYLER's cocaine supplier] came and got his change [WARE owed to the supplier for WARE's

purchase of cocaine]. I didn't want to be holding on to it. Tell him to give what he owe us too.

That's what I really need." TYLER said , "it was the forty again." WARE laughed and said, "Hey,

we gotta do what we gotta do. He [TYLER's supplier] killin' us on the numbers [price of cocaine]

so he gotta be right [with the quantity of cocaine]." TYLER stated, "All the time."

Q.    **May 11, 2007 Distribution of Cocaine to BOBBY MITCHELL to BARRY WARE via MELVIN HOLMES.**

85.    On or about May 11, 2007, at approximately 9:45 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #4745). During the call, WARE asked, "You ain't ready tonight [to purchase more cocaine]?" MITCHELL stated, "Nigger, "I'm ready now." WARE asked, "Where you at?" MITCHELL stated, "I'm at the spot. Where you need me to be?" WARE told MITCHELL to "Get ready." MITCHELL stated, "I'm sitting on the motherfucker [narcotics proceeds] now. So, all you gotta do, is dude [MELVIN HOLMES] gonna shoot through [with additional narcotics proceeds]?" WARE stated, "You might have to shoot through to [meet] dude [HOLMES]." MITCHELL stated, "Well, call him and call me and let's get it on [complete the cocaine transaction]."

86.    At approximately 10:05 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL. MITCHELL stated, "I'm ready man." WARE stated, "Okay, let me get the deuce [two ounces of cocaine]." MITCHELL replied, "I had to grab that [money] and get over there. I had to move so I can go ahead and go on. See what I'm sayin?" WARE stated, "I need about ten minutes and I can holler at you." MITCHELL stated, "Alright."

87.    At approximately 10:17 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to BOBBY MITCHELL (call #4752). WARE told MITCHELL, "Head over to MELVIN's [HOLMES's residence]." MITCHELL stated, "Alright." Based on the foregoing, I believe that WARE instructed MITCHELL to go to HOLMES's residence in order to obtain cocaine from HOLMES.

**R.    May 12, 2007 Call Regarding Crack Cocaine Distribution Involving BARRY WARE and TERRY PETEN.**

88.    On or about May 12, 2007, at approximately 11:26 p.m., BARRY WARE received an incoming call on Target Telephone Four from TERRY PETEN (call #4811).  WARE told PETEN, I got that other piece [quantity of cocaine] for you.  Can you send somebody to [get] it, with it [the money]?"  PETEN replied, "I can call [Individual N] and have him come get it."  WARE told PETEN, "Send me some change [narcotics proceeds] too, Marv."  PETEN stated, "Yeah, I'll do that."  WARE stated, "Yeah, and I'll send that other piece [quantity of cocaine] to you.  That will make you get done?"  PETEN stated, "Yeah, that should make me be done."  WARE told PETEN, "It's chunky [in the form of crack cocaine] too.  It ain't like that other one."  PETEN asked, "Is we dead BARRY [is the WARE organization out of cocaine to sell]?  WARE stated, "Yeah, but I should be straight [have a supply of cocaine to sell] today, though."  PETEN stated, I got the chizange [money] on me [to buy additional cocaine].  You know what I'm sayin'?"

**S.    June 2, 2007 Calls Regarding Unifying the Prices of Crack Cocaine Involving BARRY WARE, GARY McDONALD, DEVON TYLER and Individual E.**

89.    On or about June 2, 2007, at approximately 8:29 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #158).

a.    During the call, McDONALD told WARE that "you [WARE] ain't touched [sold] your shit [cocaine], let me get it."  WARE stated, "you ain't ran through [sold] yours [cocaine] nigger."  McDONALD stated, "man, let me get my other two [ounces of cocaine] then . . . then I'll have a full nine [ounces of cocaine] then."  WARE stated "I know you will."  WARE then told McDONALD that "half that shit [cocaine] gone."  McDONALD asked WARE "on the soft side?"  I believe that McDONALD was referring to powder cocaine.  WARE stated, "Umhmm, and I cooked

43

the rest [of the cocaine] up [into crack cocaine]."

        b.      Later during the same conversation, WARE and McDONALD discussed shorting customers on the weight of crack cocaine they purchased. McDONALD told WARE "you better make them [packages allegedly containing 3 ounces of crack cocaine] 2.5 [ounces]." WARE responded that he gave his customers "3" (ounces of crack cocaine when they purchased 3 ounces of crack cocaine). McDONALD told WARE, "don't do that man, you fuckin' the game up [by not shorting the customers on the weight of the crack cocaine]." WARE stated that McDONALD was the one that started shorting customers by using that "broke ass, mother fuckin', fucked up clock that you had." I believe that WARE was telling McDONALD that McDONALD had started shorting customers on the weight of crack cocaine they purchased by using a broken scale to weigh his crack cocaine. McDONALD explained that "we had already been, we, [Individual E] had already been making them 2.5. Me, [Individual E], and DEVON [TYLER]." I believe that McDONALD, Individual E, and TYLER were all shorting their customers by giving them 2.5 ounces of crack cocaine when the customers paid for 3 ounces. WARE stated, "Well shit, I better make mine [his 3 ounce packages of crack cocaine] 2.5 [ounces] then." Later during the same conversation, McDONALD and WARE discussed the price they would charge for 1/8 ounce of crack cocaine. McDONALD told WARE that "DEVON" (TYLER) was "selling his for [$]125." I know that $125 is consistent with the price drug dealers charged customers for 1/8 ounce of crack cocaine in the Joliet area in June 2007. WARE asked, "What?" McDONALD said that he, Individual E and "DEVON" (TYLER) were going to sell at the same price. I believe that McDONALD was telling WARE that he, Individual E and DEVON TYLER were each going to sell 1/8 ounce quantities of crack cocaine for $125.

**T.    June 2-3, 2007 Collection of Cocaine Proceeds from KEVIN WADDELL.**

90.    On or about June 2, 2007, at approximately 10:22 a.m., BARRY WARE received an incoming call on Target Telephone Five from KEVIN WADDELL (call #109).  WARE answered the telephone by stating to WADDELL, "Boy, you're one hard character to get some ends [narcotics proceeds] out of."  WADDELL stated that he didn't feel like "counting all that stuff [narcotics proceeds] from last night so I just waited until I figured it out, so I'm getting ready to come down now and I'll just bring it [narcotics proceeds] straight to you [bring the proceeds from WADDELL's drug sales to WARE]."

91.    On or about June 3, 2007, at approximately 9:27 a.m., BARRY WARE received an incoming call on Target Telephone Five from KEVIN WADDELL (call #185).  WARE answered the call stating, "Wake up Bennylicious, I'm coming up there [to see WADDELL].  WADDELL told WARE that he had "like 20[$20,000 in narcotics proceeds] now."  WARE told WADDELL, "You been rippin' [selling a lot of cocaine], ain't you nigga."  WARE told WADDELL that he could make that happen for him [resupply him with cocaine]."

**U.    June 3, 2007 Distribution of Cocaine and Seizure of One Kilogram of Cocaine from GREGORIO RODRIGUEZ.**

92.    Between June 2, 2007 and June 3, 2007, BARRY WARE brokered a two kilogram cocaine transaction between Individual Q and GREGORIO RODRIGUEZ.  The transaction took place on June 3, 2007.  On June 2, 2007 and June 3, 2007, BARRY WARE brokered a one kilogram cocaine transaction between other members of the WARE Organization and GREGORIO RODRIGUEZ, which resulted in the seizure of one kilogram of cocaine from GREGORIO RODRIGUEZ.

93.     On or about June 2, 2007, at approximately 1:12 p.m., BARRY WARE received an incoming call on Target Telephone Five from GREGORIO RODRIGUEZ[13] (call #129). During the call, RODRIGUEZ told WARE, "I'm ready [to conduct a cocaine transaction]." WARE stated "okay."

94.     At approximately 1:58 p.m., BARRY WARE received an incoming call on Target Telephone Five from GREGORIO RODRIGUEZ (call #132). RODRIGUEZ asked WARE what he wanted him to do (with respect to the cocaine transaction). WARE told RODRIGUEZ that he was trying to find "they guy [WARE's cocaine customer]" and "see what he says [with respect to the cocaine transaction]."

95.     At approximately 2:53 p.m., BARRY WARE received an incoming call on Target Telephone Five from Individual Q (call #137). WARE asked the caller "What's up, [Individual Q]?" During the call, WARE said that "he [RODRIGUEZ] got them [kilograms of cocaine]." Individual Q asked WARE "what he [RODRIGUEZ] got?" WARE replied "two of them [kilograms of cocaine]." Individual Q asked "that's all?" Individual Q went on to say that he "might want three

---

[13]The identification of GREGORIO RODRIGUEZ in this Affidavit is based on the following. First, law enforcement identified RODRIGUEZ during surveillance. Second, RODRIGUEZ identified himself to law enforcement during a June 3, 2007 traffic stop of RODRIGUEZ. Third, law enforcement has been able to identify RODRIGUEZ's voice because: that voice has been intercepted numerous times on Target Telephone Five; RODRIGUEZ was identified or identified himself in many of those calls by name or by the nickname "George"; during particular intercepted calls, RODRIGUEZ arranged to personally meet with co-conspirators and that meeting was surveilled by law enforcement; and law enforcement officers familiar with RODRIGUEZ's voice have identified RODRIGUEZ's voice on certain intercepted calls. More specifically, on June 3, 2007, JPD officers conducted a traffic stop of RODRIGUEZ, during which an officer engaged in conversations with RODRIGUEZ. That JPD officer has listened to intercepted calls on Target Telephone Five involving RODRIGUEZ and identified RODRIGUEZ as one of the speakers in those calls.

or four them [kilograms of cocaine]," but that he "definitely wants them two [kilograms of cocaine]."
WARE told Individual Q that he would call RODRIGUEZ and tell him to "hold on to them [two
kilograms of cocaine]."

96.     At approximately 2:55 p.m., BARRY WARE placed an outgoing call on Target
Telephone Five to GREGORIO RODRIGUEZ (call #138). WARE told RODRIGUEZ to "lay down
and relax for awhile, in a couple, about an hour, he's [Individual Q] gonna come this way. He
definitely want it [the kilograms of cocaine]. He told you not to do nothing with them [sell the
kilograms of cocaine]." RODRIGUEZ stated, "that's all I want to know." WARE told
RODRIGUEZ that his "guy [Individual Q] might want to get more [cocaine] tomorrow."
RODRIGUEZ explained that he was using "two different companies [sources of cocaine supply]"
and that one of them "closed the store [was not selling cocaine] until Monday [June 4, 2007]," but
that he could call the "other company [source of cocaine supply]."

97.     BARRY WARE had several additional conversations over Target Telephone Five
with GREGORIO RODRIGUEZ and Individual Q on June 2, 2007 (call ## 137, 138, 140, 149, 157,
160 and 161). During these calls, WARE, RODRIGUEZ and Individual Q agreed that the cocaine
transaction would occur on Sunday, June 3, 2007.

98.     On or about June 3, 2007, at approximately 9:00 a.m., BARRY WARE placed a call
on Target Telephone Five to GREGORIO RODRIGUEZ (call #175). WARE told RODRIGUEZ
that he was going to call "this guy" (Individual Q) so that they could "take care of business"
(complete the cocaine transaction). At approximately 9:59 a.m., WARE received an incoming call
from Individual Q on Target Telephone Five (call #188). Individual Q stated that he was "ready"
(for the cocaine transaction). WARE told Individual Q that he would see if he could do "it" (the

47

cocaine transaction) at "one of these broad's crib" (at the home of one of WARE's girlfriends) and would call Individual Q back.

99.    At approximately 10:04 a.m., BARRY WARE placed an outgoing call on Target Telephone Five to GREGORIO RODRIGUEZ (call #189). WARE told RODRIGUEZ that "guy" (Individual Q) was on his way and that RODRIGUEZ should meet WARE on "Black Road [a street in Joliet, Illinois] right away" (in order to complete the cocaine transaction). RODRIGUEZ stated he would be about ten minutes.

100.    At approximately 10:09 a.m., BARRY WARE placed an outgoing call on Target Telephone Five to Individual Q (call #190). WARE told Individual Q to come over to "the one spot over there, off of Larken and Ingalls, by that where you turn by the Walgreens." WARE told Individual Q to get off on "Weber Road" (a road in Joliet, Illinois) and that "Weber Road will take you right there." WARE told Individual Q to come to the meet location "right now." Based on subsequent surveillance of Individual Q and RODRIGUEZ, I believe WARE was telling Individual Q to come to a residence at 1107 Gael Street in Joliet. Illinois Secretary of State records reflect that LAQUINTA MOFFETT's address is 1107 Gael Street in Joliet (hereinafter "MOFFETT's residence").

101.    At approximately 10:43 a.m., BARRY WARE received an incoming call on Target Telephone Five from GREGORIO RODRIGUEZ (call #195). RODRIGUEZ stated, "yeah, okay" (indicating RODRIGUEZ was ready to supply WARE with cocaine). WARE stated "Yeah" (indicating WARE was ready for RODRIGUEZ to supply him with cocaine).

102.    At approximately 10:51 a.m., BARRY WARE received an incoming call on Target Telephone Five from Individual Q (call #197). Individual Q told WARE that he was "outside" (of

the meet location).

103     At approximately 11:13 a.m., BARRY WARE placed an outgoing call on Target Telephone Five to GREGORIO RODRIGUEZ (call #198). WARE told RODRIGUEZ to "come on back George." I believe that RODRIGUEZ had distributed cocaine to WARE on a fronted basis. I further believe that WARE had distributed the cocaine to Individual Q, at which time WARE received payment for the cocaine from Individual Q. I believe that WARE was arranging to meet with RODRIGUEZ so that WARE could deliver payment for the cocaine to RODRIGUEZ.

104.    At approximately 12:51 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to GREGORIO RODRIGUEZ (call #204). RODRIGUEZ told WARE that "everything came out alright" (RODRIGUEZ received the correct payment for the cocaine). WARE told RODRIGUEZ that he needed "one or two more" (kilograms of cocaine) now. RODRIGUEZ told WARE that he had to go "pick them [kilograms of cocaine] up." WARE told RODRIGUEZ to "get them on hand, that's all I need you to do."

105.    At approximately 2:05 p.m., BARRY WARE placed an outgoing call to GREGORIO RODRIGUEZ on Target Telephone Five (call #211). WARE asked RODRIGUEZ if he was "able to make anything happen [find additional kilograms of cocaine]?" RODRIGUEZ stated that "the guy [cocaine supplier] is here right now." RODRIGUEZ asked "what is what you want and what time you want it?" WARE responded "I need one [kilogram of cocaine] like right real fast and then another one [kilogram of cocaine] later. I need one [kilogram of cocaine] right now" RODRIGUEZ stated that he would have to go pick "it" (the kilogram of cocaine) up himself and WARE would have to wait "a couple of hours" (to receive the cocaine). WARE told RODRIGUEZ to go get "it" (the kilogram of cocaine).

106.    At approximately 2:13 p.m., BARRY WARE received an incoming call on Target Telephone Five from GREGORIO RODRIGUEZ (call #212). RODRIGUEZ told WARE that he was on his way and that he would be back in a "couple of hours with a handful [of kilograms of cocaine]." WARE stated "alright, that's good."

107.    At approximately 3:00 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to KEVIN WADDELL (call #215). WARE asked WADDELL, "How close you is Benny [to delivering the narcotics proceeds]?" WADDELL told WARE that he was "real close." WADDELL explained that he was just waiting on his "night guy [one of WADDELL's workers]." WARE asked WADDELL if he was "down here" [in Joliet]. WADDELL told WARE that he was, but he need to go back to his "crib" (home) because he didn't want to "chance it" (take the chance that law enforcement or others would take the money from him). WARE told WADDELL that he would "put it up" (store the narcotics proceeds) for him. WARE told WADDELL to not ride around with the "ends" (narcotics proceeds) because law enforcement is "snatching motherfuckers out of their cars and checking motherfuckers shit without they consent." WARE told WADDELL that he needed to go to his destination and "that's it." WARE later told WADDELL to call him back because "he [GREGORIO RODRIGUEZ] on his way to get it [the cocaine]." WARE said that was about an hour ago so that RODRIGUEZ was about an hour away.

108.    At approximately 3:03 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #216). McDONALD told WARE than one of his customers called him and told McDONALD that he wanted "half" (½ kilogram of cocaine) of what he got the other day. WARE told McDONALD to tell McDONALD's customer "12" ($12,000 for ½ kilogram of cocaine). I know that $12,000 is consistent with the price of ½ kilogram of cocaine

in the Joliet area in June 2007. WARE told McDONALD that he wasn't sure if his supplier (RODRIGUEZ) "is gonna go half" [would be willing to sell kilograms of cocaine in ½ kilogram quantities]". WARE told McDONALD to go ahead and tell his customer that it will be $12,000 and he'll check with his supplier (RODRIGUEZ).

109.    At approximately 3:06 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #219). McDONALD stated that "they [McDONALD's customer] want me to ask you to see if he'll do it for 11-5 [$11,500 for one-half kilogram of cocaine]." WARE said, "Fuck that [] shit." WARE told McDONALD that he needed to check and see if "the dude" (RODRIGUEZ) would split "it" (the kilogram of cocaine). WARE said that he doubted "he [RODRIGUEZ] will split it [the kilogram of cocaine]."

110.    At approximately 3:44 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD. McDONALD told WARE that his customer was "ready for the whole one [kilogram, rather than ½ kilogram, of cocaine]." WARE told McDONALD that he would call the "guy [RODRIGUEZ] and see if he'll do it [sell a kilogram of cocaine to McDONALD's customer]."

111.    At approximately 4:03 p.m., BARRY WARE placed an outgoing call to GREGORIO RODRIGUEZ on Target Telephone Five (call #234). WARE asked RODRIGUEZ if he was on his way back. RODRIGUEZ said, "Yeah, should be an hour. What do you need?" WARE stated he needed "maybe two or three [kilograms of cocaine]." RODRIGUEZ stated that he had "a handful [of kilograms of cocaine], just let me know so I can stop over and drop [off with WARE] whatever [quantity of cocaine]." WARE stated that he had "the paperwork [money] for one [kilogram of cocaine]," but "I got to get the paperwork [money] for the other two [kilograms of cocaine]."

51

RODRIGUEZ stated that he would bring "the one [kilogram of cocaine]." WARE instructed RODRIGUEZ "just bring the one [kilogram of cocaine] for now." RODRIGUEZ stated, "yeah, okay."

112.    At approximately 5:05 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to GREGORIO RODRIGUEZ (call #243). WARE told RODRIGUEZ to "stop over here on Raynor [a street in Joliet, Illinois]. I got the paperwork [money] for one [kilogram of cocaine] right now." RODRIGUEZ said "okay" and informed WARE he was "twenty minutes" away. RODRIGUEZ stated he was going to stop "for a minute or two" and then "go there [to deliver the cocaine to WARE]." RODRIGUEZ told WARE that he would "get the other ones [kilograms of cocaine] ready for later on, whatever, okay?"

113.    At approximately 5:33 p.m., law enforcement observed RODRIGUEZ leave the area of 1015 Charlesworth Street, Joliet, Illinois in a 2004 Honda Pilot bearing Illinois registration number 7631063 (hereinafter "the Pilot"). Illinois Secretary of State records reflect that the Pilot is registered to Individual B and Individual C at 402 Harwood Street, Joliet, Illinois. Surveillance observed RODRIGUEZ in the passenger seat. Surveillance further observed a young Hispanic male, later identified as Individual B, driving the Pilot. Surveillance followed the Pilot to the intersection of Henderson Street and Jackson Street in Joliet, where, based on the intercepted calls between RODRIGUEZ and WARE on Target Telephone Five, JPD officers conducted a traffic stop of the Pilot as it began traveling westbound on Jackson Street. During the traffic stop, law enforcement identified the driver of the vehicle as being Individual B from Individual B's Illinois Driver's License and the occupant of the vehicle as being GREGORIO RODRIGUEZ from RODRIGUEZ's Illinois Driver's License.

52

114.    Based on the intercepted calls between GREGORIO RODRIGUEZ and WARE on Target Telephone Five, JPD officers conducted a search of RODRIGUEZ' vehicle. During the search of the Pilot, the JPD Officers recovered a small beverage cooler from the rear passenger seat of the Pilot. The Officers opened the container and found it to hold a brick-shaped object containing a white powdery substance wrapped in clear plastic. The JPD Officers took custody of the brick-shaped object and released RODRIGUEZ and Individual B without charges in order to preserve the secrecy of the ongoing investigation.

115.    The DEA North Central Laboratory analyzed the contents of the brick-shaped object and found them to contain approximately 980.9 grams of mixtures and substances containing cocaine.

116.    At approximately 6:53 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #273). McDONALD said his customer would be ready in about 45 minutes. WARE stated, "I don't know man. This dude [GREGORIO RODRIGUEZ] ain't answering the phone. I think something happened." McDONALD stated, "Ah man." WARE told McDONALD to tell his customer to "hold up." WARE said he would talk to DEVON (TYLER) and see if DEVON (TYLER) could "do it [supply McDONALD's customer with a kilogram of cocaine]." McDONALD said, "Alright."

117.    On or about June 4, 2007, at approximately 8:51 a.m., BARRY WARE made an outgoing call on Target Telephone Five to Individual I (call #315). During the call, WARE told Individual I that he was not "feelin' right around this motherfucker. It's feelin' like it's hot around this motherfucker." I believe that WARE was telling Individual I that he believed that law enforcement was investigating WARE and the WARE Organization. WARE told Individual I that

53

"GERALD [LINDSEY] and them [other members of the WARE Organization] called me and they had got they change together [for the purchase of one kilogram of cocaine from GREGORIO RODRIGUEZ] and I got with dude [RODRIGUEZ]. He [RODRIGUEZ] had called me to do it [made arrangements to deliver the cocaine to WARE] and he [RODRIGUEZ] got caught [by JPD officers during a traffic stop on June 3, 2007] going to do it [deliver the one kilogram of cocaine to WARE]." WARE told Individual I that "dude [RODRIGUEZ] never made it back [to deliver the cocaine to WARE]." Individual I told WARE "something went wrong then [in order to alert law enforcement to RODRIGUEZ's possession and impending distribution of cocaine to WARE]." WARE agreed and told Individual I that "they [WARE's customers] wasn't involved or nothing like that." Individual I asked WARE why "he" (RODRIGUEZ) didn't get "locked up." WARE responded "I don't know. That's what I was tryin' to find, see, they [RODRIGUEZ's associates] got me in the back [gave WARE access to RODRIGUEZ]. I don't know him personally."

### V.    June 3, 2007 Efforts of BARRY WARE, GARY McDONALD, and DEVON TYLER to Obtain a Cocaine Supply.

118.    Following the seizure of one kilogram of cocaine from GREGORIO RODRIGUEZ on June 3, 2007, BARRY WARE, GARY McDONALD and DEVON TYLER discussed obtaining cocaine from TYLER's source of supply.

119.    On or about June 3, 2007, at approximately 7:00 p.m., WARE placed a series of outgoing calls on Target Telephone Five to GARY McDONALD (call ##278, 279, and 280). During these calls, WARE told McDONALD to call "DEVON" (TYLER) and see if he could provide then with kilogram quantities of cocaine. WARE gave TYLER's telephone number to McDONALD.

120.    At approximately 7:25 p.m., BARRY WARE received an incoming call on Target

Telephone Five from DEVON TYLER (call #288). WARE asked TYLER if "Worm [GARY McDONALD]" called him. TYLER said that he had. WARE then asked if TYLER's "dude [cocaine supplier] cool [has cocaine to sell]?" TYLER stated that he was. WARE then told TYLER that WARE might "need one [kilogram of cocaine]." WARE then told TYLER to "let me know if he cool." TYLER said, "Okay."

121.    At approximately 7:36 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #289).

a.    During the call, McDONALD told WARE that DEVON [TYLER] was supposed to come over and talk to him, but then was not answering his phone. WARE could be heard contacting an individual on another telephone. WARE could be heard asking the individual if he was going to talk to "Worm" (McDONALD). The individual responded that he was "on his way [to talk to McDONALD]." The voice of that individual is that of TYLER. McDONALD told WARE that he "hate to have a motherfucker come out here with that money like that [large sums of narcotics proceeds]."

b.    Later during the same call, WARE said that he thought his "cousin's people [GREGORIO RODRIGUEZ] got popped off [stopped by law enforcement]" and that's why he "shut it [the cocaine transaction] down." McDONALD told WARE that "that shit [cocaine obtained from RODRIGUEZ] got like a gas taste to it." WARE told McDONALD that that is why they were "going to DEVON [TYLER to obtain cocaine]." McDONALD asked WARE if TYLER had "the same weight [quantities of cocaine]." WARE said, "He got the same weight [quantities of cocaine], he does [sells] deuce [two kilogram quantities of cocaine], they [other suppliers] does [sell] deuce [two kilogram quantities of cocaine], all of them does [sells] deuce [two kilogram quantities of

cocaine] anyway so it doesn't really matter."

122.    At approximately 7:56 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #293). McDONALD told WARE to "chirp [call] him [TYLER] again" to see how long until he [TYLER] get there [with the cocaine] because [Individual R] just called him and said that he is counting the money [for the cocaine] now." WARE said, "Alright." WARE called McDONALD approximately three minutes later (call #294) and told McDONALD that he (TYLER) would be there in 25 minutes.

123.    At approximately 9:07 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to GARY McDONALD (call #304). McDONALD said, "this boy [DEVON TYLER] ain't made it over here yet man." WARE said, "Man, DEVON [TYLER] is slow man. That's why I told you, I'm gonna hate you to miss that money. He gonna come through. Oh, and he said dude only got one [kilogram of cocaine]." WARE stated that he would be glad when he finds "somebody else [from whom to obtain cocaine]." WARE said he wanted "somebody [a cocaine supplier] I can just go to, give them my money, and be done." McDONALD said that he wished "he" (TYLER) "was 21 [charging $21,000 per kilogram], a motherfucker can make two stacks [$2,000] off that shit." WARE stated, "Hell yeah. 500 [$500] ain't no money, but I ain't gonna turn it down. I wanna make me a stack [$1,000] or more doing that shit." McDONALD told WARE that he'll wait for "it" (the cocaine from TYLER). Based on the foregoing, I believe that TYLER's source of supply was selling cocaine for at least $22,000 per kilogram.

124.    On or about June 4, 2007, at approximately 5:56 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to GARY McDONALD (call #383). McDONALD asked WARE if he had talked to "DEVON" (TYLER). WARE said that he had not talked to him. WARE

stated. "I hope his ass can do something [obtain a cocaine supply] for us." McDONALD asked

WARE, "What about your boy [another cocaine supplier] up there?" WARE said, "He's six dollars

[$6,000 for 1/4 kilogram of cocaine] Worm. I ain't tryin' to pay no six dollars [$6,000 for 1/4

kilogram of cociaine]." McDONALD told WARE, "Man, you better tell a nigger to come on down

[reduce the price] with that shit [the cocaine]." WARE said that there was nothing he can do about

it. WARE then stated, "If I don't get nothin' [no cocaine] from DEVON [TYLER], I'm gonna go

holler at him [another supplier] man cuz I can't wait no more, I got some bills due [WARE would

call the other supplier despite his high price]." McDONALD agreed, stating that he needed the

money too.

125.     At approximately 6:15 p.m., BARRY WARE placed an outgoing call on Target

Telephone Five to DEVON TYLER (call #384). WARE asked TYLER, "You ain't talk to that guy

[TYLER's cocaine supplier] Big D?" TYLER stated, "Yeah, I just talked to that chump." TYLER

stated that "he over there with his guy right now takin' care of the business. He gonna call me in a

few minutes." TYLER then said, "Shit, that one he had [kilogram of cocaine], he dumped it [sold

it to someone else]." WARE stated, "So he said he might have some more?" TYLER replied,

"That's what he doing now. He said dude got some more. It was two [kilograms of cocaine] right?"

WARE stated, "Yeah, two [kilograms of cocaine]." WARE asked, "Did you talk to Worm [GARY

McDONALD]?" TYLER stated that he had.

126.     On or about June 4, 2007 at approximately 7:05 p.m., BARRY WARE received an

incoming call on Target Telephone Five from GARY McDONALD (call #395). McDONALD asked

WARE if he talked to "DEVON [TYLER]." WARE stated that he did and that, "he on top of it. He

said dude fittin to go get some [cocaine] for us." McDONALD asked, "For both of us?" WARE

said, "Yeah." WARE then asked if Individual R is "trying to do something to [obtain cocaine]." McDONALD stated that he was. WARE said that he better call him [TYLER] and tell him three [kilograms of cocaine] then.

127.   At approximately 7:16 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to DEVON TYLER (call #396). WARE stated, "You told them earlier a deuce [two kilograms of cocaine] right?" TYLER said, "Yeah." WARE stated, "No man, it's three [kilograms of cocaine]. I need a deuce [two kilograms of cocaine] my damn self." TYLER stated, "Oh man." WARE told TYLER to, "Tell him to see if he can do a trey [three kilograms of cocaine]." WARE stated, "Call him back and see what he say. Hit [call] me right back."

128.   At approximately 8:03 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to KEVIN WADDELL (call #401).

   a.   During the call, WARE told WADDELL that "[Cocaine supplier] did call me back. He said he could do it [supply WARE with two kilograms of cocaine], but it's five dollars more [$500 more] and he can't do it until tomorrow." WADDELL asked, "We gotta wait until tomorrow evening then, huh?" WARE stated, "That's the only thing about it. Let's see if DEVON [TYLER] come though [obtains the cocaine]." WADDELL stated, "If he don't, then we'll go with [another cocaine supplier], then that's for sure. We don't gotta ship nothing off nowhere else and, you know? Cuz it's prime time, I hate prime time." WARE stated, "I'm gonna call DEVON [TYLER] one more time, see what he say. Man, I'm getting ready to shut it down and sit down, cuz I don't like doing nothing." WARE then stated, "I gotta little something [cocaine] but I'm waiting to mess with it cuz I'm gonna need it to pay some bills." WADDELL asked, "Oh, you got what, the other way?" WARE stated, "Nah, I got some fizzoft [powder cocaine], I just hadn't messed with

58

it [cooked it into crack cocaine] yet. I'm gonna have to frizzo that up though [cook it into crack cocaine] because I got [Individual P] rent due, I got a thousand dollars, both car notes due, I got the rent due." WADDELL stated, "My car note due in the morning for the Magnum." As set forth in greater detail below, surveillance has observed WADDELL driving a silver Dodge Magnum bearing Illinois license plate G964088 (hereinafter "the Magnum"). Illinois Secretary of State records reflect that the Magnum is registered to Individual X at 713 Joliet Street, Joliet, Illinois.

       b.     During the same call, WARE stated, "So, if I don't do nothing [obtain cocaine] today, I'm gonna wait on [another cocaine supplier], if not, I'm gonna go up there and pay twelve [$12,000 for ½ kilogram of cocaine] to dude. I gotta do what I gotta do. Cuz I got enough to get a half [kilogram of cocaine] and some more but I'd kinda like to get the whole one [kilogram of cocaine] but the hit, it's turned around. It's [the price of cocaine] out there [too high]." WARE concluded the conversation stating, "Let's wait and see what DEVON [TYLER] say." WADDELL stated, "Okay."

      129.    At approximately 8:13 p.m., BARRY WARE received an incoming call on Target Telephone Five from DEVON TYLER (call #403). WARE asked, "What's up with your man [cocaine supplier] and that number?" TYLER stated, "He said it's kinda warm outside his house right now [law enforcement activity], he can't move right now. He'll call me when everything cools off."

      130.    At approximately 8:15 p.m., WARE received an incoming call on Target Telephone Five from KEVIN WADDELL (call #407). WARE stated that he just called "DEVON [TYLER] . . . he said dude said it's kinda warm around his house." WARE told WADDELL, "I don't like the way that sounds. You know, I'm about to just wait and holla at [another cocaine supplier]."

WADDELL agreed. WARE stated, "All this night time stuff and DEVON [TYLER] had gotten pulled over with that change [narcotics proceeds], I'm kind of scared. I ain't even gonna lie to you." WADDELL agreed, stating, "Me too." WADDELL reiterated, "That would be putting all my change [all my money] in on pot. I'd rather wait for dude [another cocaine supplier] cuz we know he gonna bring it to us." I believe that WARE was saying he was not comfortable having TYLER purchase cocaine on behalf of the WARE Organization because of the risk that law enforcement could seize the money for the cocaine. I further believe that WARE felt safer dealing with Individual S based on their history of dealing with one another.

131.    At approximately 8:50 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #408). WARE stated that he just called "DEVON" (TYLER). WARE stated that "he" (TYLER) said that "the dude he messin' with [obtaining cocaine from] said it's hot around his house [there is police activity around his house]." WARE stated, "I'm not even fittin' to be playin' with [buying cocaine from] them man. I think I'm just gonna say 'fuck it'." McDONALD asked what was up with the "dude [Individual S] by your house?" WARE stated that "he's cool" (WARE would buy cocaine from Individual S), but that WARE had not called him. McDONALD told WARE that he needed "something" (cocaine) today. WARE told McDONALD, "I'll check it out for you in a second."

132.    At approximately 9:43 p.m., BARRY WARE placed on outgoing call on Target Telephone Five to GARY McDONALD (call #412).

   a.      During the call, WARE told McDONALD that "this dude [Individual S] talkin' about that he can't do nothin' [sell cocaine] 'till the morning neither. He said he straight though [has cocaine]." McDONALD stated "That's what DEVON [TYLER] sayin' too." WARE

then stated that he might "have another lick [source of supply for cocaine]" but would have to wait until "that guy" (the other source of supply) got off from work the next day. WARE stated, "You know, I ain't feelin' comfortable with that late at night DEVON [TYLER] getting pulled over and all that shit. I don't really feel comfortable about that shit Worm. We got to be careful of that. We can't have them motherfuckers [law enforcement] taking our shit [cocaine or money for cocaine]. We're lucky that wasn't us [getting pulled over like GREGORIO RODRIGUEZ was the previous day] man."

    b.  Later during the same call, McDONALD asked if WARE talked to "that dude [Individual T]?" McDONALD stated that cocaine he previously obtained from Individual T "had a smell to it but that shit was fly [of high quality]." WARE stated, "Well I don't give a fuck it that motherfucker [cocaine] got a smell or taste. If I get it, I'm selling that shit [cocaine]. I don't give a fuck." McDONALD then stated, "You know all that bad shit you had, ain't nobody that could get it off [sell the cocaine] but me and [Individual U]." WARE and McDONALD laughed as WARE stated, "I don't give a fuck if I get some toe jam, I'm selling that shit." McDONALD stated, "You would load us [members of the WARE Organization] up with that puss-assed shit [poor quality cocaine] too." WARE then laughed as he told McDONALD, "Hey, it's gone, and we made some money."

  **X.**  **June 5, 2007 Complaint of MELVIN HOLMES Regarding Quality of BARRY WARE's Cocaine.**

  133. On or about June 5, 2007, at approximately 10:21 a.m., BARRY WARE received an incoming call on Target Telephone Five from MELVIN HOLMES (call #423). HOLMES told WARE, "you can't be doin' that type of shit for real man . . . you cut, you can see all through the

shit [cocaine] man." I believe that HOLMES was telling WARE that he put too many adulterants in the cocaine WARE had given HOLMES to sell. I know drug traffickers to add adulterants to cocaine in order to make a greater quantity of cocaine. I know that this process also reduces the potency of the cocaine. WARE told HOLMES, "This stuff [the cocaine and the adulterants] didn't mix up good . . . just get rid of it [sell the cocaine]."

**Y.    June 5, 2007 Distribution of Cocaine to the WARE Organization by Individual S.**

134.    On June 5, 2007, BARRY WARE coordinated the purchase of two kilograms of cocaine on behalf of the WARE Organization from Individual S. WARE collected money for the purchase from members of the WARE Organization, and provided the money to Individual S. Individual S detected law enforcement surveillance after receiving the money for the cocaine transaction. Law enforcement was not able to effectuate a traffic stop of Individual S and seize the money for the cocaine transaction.

135.    On or about June 5, 2007, at approximately 9:24 a.m., BARRY WARE received an incoming call on Target Telephone Five from Individual S (call #419). WARE told Individual S to call "his guy" (his cocaine supplier) and make sure that "it" (the cocaine transaction) was a "for sure thing." WARE stated that he was going to "get everything [money for his purchase of cocaine] together" and wait for Individual S. Individual S stated that "he [his cocaine supplier] said it [the cocaine transaction] was a for sure thing yesterday." WARE asked Individual S how he has to do "it" (the cocaine transaction). Individual S stated that he needed to go where his supplier was at "with the documentation [WARE's money for the cocaine] ready." Individual S stated that when he got off work at "2:00 or 3:00 [p.m.]" he was going to head out by WARE. WARE told Individual

S to let WARE know when he gets off or work so that WARE can "get ready" (for the cocaine transaction). Individual S agreed to do so.

136.    At approximately 9:59 a.m., BARRY WARE received an incoming call on Target Telephone Five from KEVIN WADDELL (call #422).

a.    During the call, WARE told WADDELL that he just talked to Individual S and that "it's [the cocaine transaction] a for sure thing". WARE told WADDELL that after Individual S got off work he was "going to come snatch the paperwork [money for the cocaine] from us and then go get it [the cocaine] and come right back [with the cocaine]." WADDELL told WARE that he had "like 21" (WADDELL had $21,000 available to purchase cocaine). WARE informed WADDELL that WADDELL would need to come up with another "15" ($1,500) because "dude is '22-5'" (Individual S was charging WARE $22,500 per kilogram of cocaine). WARE stated that he was going to try to get Individual S to "come up off that" (lower the price of cocaine).

b.    Later during the same call, WARE stated that he was attempting to buy the cocaine with other people because WARE was trying to buy "three ninas" (three nine ounce quantities of cocaine), but WARE did not have all of the money for the cocaine. WARE stated that he might "cut Big Gerald [GERALD LINDSEY] in (on the purchase of cocaine)" unless WADDELL wanted to "give up [allow WARE to sell a portion of the kilogram to a customer other than WADDELL] a Folgers [4 ½ ounces of cocaine of the cocaine WADDELL was going to purchase] or a Buick [2 1/4 ounces of cocaine of the cocaine WADDELL was going to purchase]." WARE suggested that WADDELL would not be willing to give up that quantity of cocaine. WADDELL stated he was willing to give up a "Folgers" (4 ½ ounces of cocaine) if it would result in being able to purchase the cocaine. WADDELL inquired whether WARE would be charging "three dollars for

63

the what's it name" ($3,000 for the 4 ½ oz. of cocaine). WARE stated that he would try to but it was

with "that cheap-ass Big Gerald [GERALD LINDSEY]." WARE told WADDELL to "come on

down there [with the money for the cocaine]" so that when Individual S got off work "we'll be ready

to go [complete the cocaine transaction]."

137.    At approximately 10:23 p.m., BARRY WARE placed an outgoing call on Target

Telephone Five to KEVIN WADDELL (call #424). WARE stated that Individual J just called him

looking to do a deal. WARE stated, "He trying to do a deal so I put his deal with yours." WARE

asked, "If you got 2-1 [$21,000], do you have 2-1 [$21,000]?" WADDELL stated, "Yeah, I got 2-1

[$21,000] but then I'll be completely broke." WARE stated that "he" (Individual J) wants "a Buick

[2 1/4 ounces or 63 grams]. WADDELL asked, "Who wants a Folgers [4 ½ ounces of cocaine]?"

WARE told WADDELL, "Nobody yet. I was gonna put somebody - I coulda got Big Gerald

[GERALD LINDSEY] but I gotta see how short I am first. I don't know how short I'm gonna be.

I'm gonna be straight [have all my money together] by the time dude [Individual S] get here."

WARE then said, "You don't want to be completely broke." WADDELL said, "Yeah." WARE

said, "You can help me [purchase additional cocaine] if you want to. But you can get some pocket

change KK, I know that." WADDELL said, "I don't know, let me get down there and see. Cuz I

know with that, what's his name, my night guy [one of WADDELL's workers] that owe me a little

change, he gotta make that up." WARE then said, "If you want me to do a Folgers, I'll slip

GERALD [LINDSEY] in there some kind of way." I believe WARE was asking WADDELL if

WADDELL would let WARE sell 4 ½ ounces of the cocaine WADDELL had intended to purchase

to someone else instead. WADDELL said, "Yeah, I'll do a Folgers [4 ½ ounces of cocaine] so I

won't be completely broke." Ware stated, "Okay."

138.    At approximately 11:18 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #427). WARE asked McDONALD, "what's going on?" McDONALD stated, "You tell me motherfucker." WARE stated, "Nigga, what you want me to tell you. I'm looking for some work [cocaine] nigga." McDONALD then stated, "Well shit, I can't do shit without you motherfucker." WARE stated, "Alright, I got something [a cocaine transaction] going for us but we can't do it until three or four o'clock [when Individual S would be available]."

139.    At approximately 2:19 p.m., BARRY WARE received an incoming call on Target Telephone Five from TERRY PETEN (call #439). WARE told PETEN that he was in "Morris [Illinois]" working on a car. WARE asked PETEN how he was "looking on change" (how much money PETEN had) and stated that WARE "done found another lick" (located a source of cocaine supply). PETEN stated that he was waiting for one of his people to "holler at [call]" him and that he should have about "12 or 13 dollars" ($12,000 or $13,000), but he has "12 dollars" ($12,000) right now. WARE told PETEN that he needs "14 dollars" ($14,000) to "put this thing together when he gets through with work" (to complete the cocaine transaction with Individual S). WARE told PETEN that "this deal" was with "his other guy [Individual S] from the City [Chicago]" and that he needed

"this deal" to go through to "keep me going [buying and selling cocaine]." WARE told PETEN to try and see if he could get him "14" ($14,000) because he "really needed it [money]" to keep "this thing [the cocaine transaction] going." PETEN stated that he would try.

140.    At approximately 3:04 p.m., BARRY WARE placed a call to KEVIN WADDELL on Target Telephone Five (call #447). WARE told WADDELL that Individual S was getting off of

work at "3:30 [p.m.]", and asked WADDELL if he had to go back home. WADDELL stated that he had not "come down" (to Joliet) yet, and that he was going to "come down there" (to Joliet). WADDELL stated that he was at home "locked and loaded" (with the money needed for the cocaine transaction). WADDELL asked WARE if he got "the people together" (whether WARE had collected the money necessary for the cocaine transaction). WARE stated that he thought WADDELL was "down [in Joliet] getting some change [money] together" (getting money together for the deal). WADDELL stated that before he left he made some calls and nobody answered the phone so he had not gone "down there" (to Joliet) because he did not want to be "playing in town for no reason." WARE told WADDELL that WADDELL needed to head "down there [to Joliet] because he [Individual S] gets off [work] at 3:30 [p.m.]" and that "he [Individual S] is in Markham, which is only 15 minutes away." WARE told WADDELL that Individual S was "going to come straight to" WARE (to complete the cocaine transaction) after work. WADDELL stated "okay."

141.    At approximately 3:07 p.m., BARRY WARE received an incoming call on Target Telephone Five from Individual S (call #449). Individual S asked WARE if he got "all the paperwork [money for the cocaine transaction] together?" WARE stated that he was "going back [to an unknown location] to do that right now." Individual S stated that he just got off work and asked WARE what WARE wanted Individual S to do. WARE told Individual S that he thought it would be best if Individual S went home and then met WARE halfway when he was ready.

142.    At approximately 3:12 p.m, BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #454). During this call, WARE told McDONALD to get his "change [money] together," and that he would send MELVIN [HOLMES] to pick it up.

143.    At approximately 3:19 p.m, BARRY WARE received an incoming call on Target

Telephone Five from GARY McDONALD (call #459). McDONALD asked about Individual R at which point WARE told McDONALD, "let's get ourselves straight first." I believe that WARE wanted to make sure that he and McDONALD had their money for the cocaine transaction ready before ensuring that others had their money ready. WARE stated that he was going to do something different and that "this guy [Individual S] is [charging] a little more [for a kilogram of cocaine], we can't make no money off him." WARE added that "we have to charge [Individual R] and them [cocaine customers] more." McDONALD asked WARE if "dude" (Individual S) was "23" (charging $23,000 per kilogram of cocaine). WARE stated that "dude 22-5" (Individual S was charging $22,500 per kilogram of cocaine). WARE stated that the price was "for sure though."

144.    At approximately 3:45 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to KEVIN WADDELL (call #463). WADDELL told WARE that WADDELL was on his way. WARE asked WADDELL what he was "fittin' to bring me?" WADDELL asked WARE what he was going to get for his "Folgers" (4 ½ ounces of cocaine). WARE stated that he was going to try to get at least "28" ($2,800) for it from Individual E or "Fat Gerald" (GERALD LINDSEY). WADDELL stated that the price was how much they (WADDELL and WARE) were paying for "it" (the kilogram of cocaine). WARE stated that he was going to try to get "3" ($3,000) but he didn't know. WARE stated that if he tried to do "28" ($2,800) with Individual E he would do "it" (the cocaine transaction) right away. WARE stated that he didn't really want to fuck with "GERALD [LINDSEY] because he's too sheisty [LINDSEY was too cheap]." WARE stated he would see what Individual E said and would then call WADDELL back.

145.    At approximately 3:47 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to Individual E (call #464). WARE asked Individual E if he wanted to get this

"fizzo in his ass" (buy 4 ½ ounces of cocaine from WARE). WARE stated that he would need

Individual E to pay "28" ($2,800) for the "it" (the 4 ½ ounces of cocaine). Individual E stated that

he had a "whole four [ounces of cocaine] left" and "nine dollars" ($9,000). Individual E suggested

that WARE call Individual Y because Individual Y had "three dollars" ($3,000) of Individual E's

money. Individual E provided WARE with Individual Y's telephone number.

146.    At approximately 4:01 p.m., BARRY WARE placed an outgoing call on Target

Telephone Five to Individual Y. WARE asked Individual Y what Individual E said. Individual Y

told WARE that Individual E told him to give WARE "28" ($2,800 for the purchase of 4 ½ cocaine).

WARE asked Individual Y when he could get "it" (the money for the purchase of 4 ½ ounces of

cocaine). Individual Y told WARE that he would have "it" (the money for the purchase of 4 ½

ounces of cocaine) in two minutes. WARE then stated that he would have Individual Z get the

money from Individual Y on "the Hill".

147.    At approximately 4:05 p.m., BARRY WARE placed an outgoing on Target

Telephone Five to GARY McDONALD (call #473). WARE yelled at McDONALD, "Come on

Worm, what you doin'?" McDONALD told WARE that he was waiting on him. WARE said, "You

didn't call me. I said call me. I gotta know when you're gonna be there so I can come get it

[narcotics proceeds to be used for the purchase of additional cocaine]." WARE asked McDONALD

where he wanted him to come to. McDONALD said that he was at his "mama's house." As WARE

said this, a female voice, believed to be McDONALD's mother, Individual AA, can be heard in the

background telling McDONALD, "Don't come around my house with no dope." Based upon a

search warrant conducted at Individual AA's residence in 2006 on a matter unrelated to this case,

law enforcement knows Individual AA to reside at 602 Whitley Avenue, Joliet, Illinois (hereinafter

68

"Individual AA's residence"). Illinois Secretary of State records reflect that Individual AA's address is 602 Whitley Avenue, Joliet, Illinois.

148.    At approximately 4:15 p.m., BARRY WARE received an incoming call on Target Telephone Five from Individual Y (call #485). During this call, WARE received an incoming call from Individual Z. Individual Z advised that she was "fittin' to put some gas" in her car and "go home." WARE clicked back over to the call with Individual Y and told Individual Y to go to "those two gas stations off Briggs Street [in Joliet]" and told Individual Y that WARE would meet him down there.

149.    At approximately 4:21 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to Individual S (call #488). During the call, WARE told Individual S that WARE was waiting for "[money from] one more guy." WARE stated that after receiving the money, he would call Individual S and meet him "somewhere [to complete the cocaine transaction]." WARE asked Individual S if he talked to his "guy" (cocaine supplier) Individual S stated that he had.

150.    At approximately 4:23 p.m., BARRY WARE received an incoming call on Target Telephone Five from KEVIN WADDELL (call #489). WARE told WADDELL that he had to go "run and grab some money from [Individual Y] right quick to make yours [WADDELL's monetary contribution to the purchase of cocaine from Individual S] right." WADDELL told WARE that WADDELL was on "Black Road" (a street in Joliet). WARE asked WADDELL "you gotta count your money [for the cocaine transaction] or anything?" WADDELL said no. WARE asked WADDELL who was with him. WADDELL stated that he was by himself. WARE told WADDELL to come on over by "JUCO [Joliet Junior College]." Based on the investigation, I know JUCO to be located near the residence of Individual A, 855 Mulford Lane, Joliet, Illinois (hereinafter

69

"Individual A's residence"). Illinois Secretary of State records reflect Individual A's address to be 855 Mulford Lane in Joliet.

151.     Law enforcement subsequently established surveillance in the vicinity of Individual A's residence. At approximately 4:36 p.m., surveillance observed KEVIN WADDELL, driving the Magnum, arrive at Individual A's residence. Surveillance observed WARE walk from Individual A's residence to the rear of the Magnum, and retrieve a brown paper bag from the trunk of the Magnum. Surveillance observed WARE return to Individual A's residence, and observed WADDELL leave the area in the Magnum. I believe that the brown paper bag WARE retrieved from the trunk of the Magnum were narcotics proceeds WADDELL was putting towards his purchase of additional cocaine with WARE.

152.     At approximately 4:26 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to Individual Z (call #491). During this call, WARE told Individual Z to meet Individual Y at "those gas stations off Briggs Street [in Joliet] and get that money [for the purchase of 4 ½ ounces of cocaine] from him." At approximately 4:27 p.m., WARE placed an outgoing call to Individual Y on Target Telephone Five (call #492) and told Individual Y that Individual Z was "coming to" meet him from "the highway" (Interstate 80).

153.     At approximately 4:30 p.m., law enforcement initiated surveillance at the Citgo Gas Station located in the area of the intersection between Briggs Street and Interstate 80. Shortly thereafter, law enforcement observed a meeting between a black female, driving a maroon SUV and a black male driving a small sedan with silver rims. I believe that the meeting was between Individual Y and Individual Z at which time Individual Y delivered the money for the 4 ½ ounces of cocaine to Individual Z.

154.    At approximately 4:34 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to Individual Z (call #496). Individual Z told WARE that she got "it" (the money for the 4 ½ ounces of cocaine). WARE told Individual Z to meet "MELVIN" (HOLMES) at Individual AA's residence for the purpose of giving HOLMES the money Individual Z had received from Individual Y. Law enforcement subsequently established surveillance of Individual AA's residence.

155.    At approximately 4:40 p.m., surveillance observed Individual Z arrive at Individual AA's residence driving a maroon SUV. At approximately 4:56 p.m., surveillance observed a silver Oldsmobile Aurora, bearing Illinois registration 6467338 (hereinafter "the Aurora"), arrive at Individual AA's residence, and park behind the maroon SUV. Illinois Secretary of State records reflect that the Aurora is registered to BARRY WARE, 927 N. Broadway, Joliet, Illinois. Surveillance observed HOLMES exit the passenger side of the Aurora, meet with Individual Z outside of Individual AA's residence, and reenter the passenger side of the Aurora. Surveillance was not able to see what, if anything, Individual Z gave to HOLMES. I believe that Individual Z provided HOLMES with money from Individual Y. At approximately 4:59 p.m., surveillance observed HOLMES and Individual Z depart the area in their respective vehicles. Surveillance followed HOLMES as he left the area in the Aurora. At approximately 5:13 p.m., surveillance observed HOLMES arrive at Individual A's residence in the Aurora. Surveillance observed HOLMES exit the passenger side of the Aurora, and enter Individual A's residence. At approximately 5:23 p.m., surveillance observed HOLMES reenter the passenger side of the Aurora and depart the area. I believe HOLMES met WARE inside of Individual A's residence, where HOLMES delivered the money HOLMES had just received from Individual Z.

156.    At approximately 4:38 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #499). McDONALD told WARE to "go get that money [for the cocaine transaction] from the girl [Individual BB], she sitting by her mama's house." WARE stated, "Okay, he [MELVIN HOLMES] close by."

157.    At approximately 5:04 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #505). McDONALD asked WARE if he "handled it [obtained the cocaine] already?" WARE told McDONALD that he needed "the ends [money for the cocaine transaction] first." WARE stated that he had to "run to the City [Chicago]" and that it's going to be a while.

158.    At approximately 6:43 p.m., BARRY WARE received an incoming call on Target Telephone Five from Individual S (call #525). Individual S told WARE that "he's [Individual S's cocaine supplier] still out partying from last night [and therefore unable to complete the cocaine transaction]." Individual S apologized to WARE. WARE stated that he would "turn around" (and not continue to the location where Individual S and WARE had agreed to complete the cocaine transaction).

159.    At approximately 7:11 p.m., BARRY WARE placed an outgoing call on Target Telephone Five to GARY McDONALD (call #529). WARE told McDONALD that "It [the cocaine transaction with Individual S] didn't go through." WARE stated "I went up there, couldn't find the motherfucker [Individual S] and I wasn't fittin' to be sitting up there with all of this change [money to purchase cocaine] man." McDONALD and WARE proceeded to discuss how badly they needed to get cocaine so they could pay their bills. WARE stated that he would keep "looking" (for a source of cocaine supply).

72

160.    At approximately 9:31 p.m., BARRY WARE received an incoming call from Individual S on Target Telephone Five (call #545). Individual S asked WARE "hey, did you uh, did you already go uh, return your movies [money for the cocaine transaction to the people from whom WARE had collected the money]?" WARE responded "not yet." Individual S stated that his "guy" (cocaine supplier) was "just over" by him and his "guy" (cocaine supplier) said that "tomorrow" (June 6, 2007) would be fine if WARE wanted to "uh, to uh, have your, have your uh, oil changed" (complete the cocaine transaction). Individual S asked WARE if he wanted him to come get the "paperwork" (money) from WARE tonight so WARE "didn't have to make too many trips [associated with the cocaine transaction]." WARE told Individual S to "come on up" to where WARE was located by "Walgreens" in Joliet. Based upon cell-tower site information from the wire intercept for this call and surveillance, law enforcement determined that WARE was in the vicinity of MOFFETT's residence.

161.    After approximately 9:31 p.m., law enforcement established surveillance of MOFFETT's residence. Law enforcement observed a maroon pickup bearing Illinois license plate 10226HB (hereinafter "the pickup") pull up to MOFFETT's residence. Illinois Secretary of State records reflect that the residence at 1107 Gael Street. Illinois Secretary of State records reflect that the pickup is registered to Individual S. Surveillance observed Individual S exit the pickup. At about that same time, surveillance observed the garage door open at MOFFETT's residence and WARE exit the garage. Surveillance observed WARE hand what appeared to surveillance to be a paper bag to Individual S in the driveway of MOFFETT's residence. WARE and Individual S spoke for about one minute. Surveillance next observed WARE return to MOFFETT's residence and Individual S return to the pickup and drive away from the area. I believe that the paper bag WARE

73

delivered to Individual S contained money for the purchase of cocaine.

162.    Surveillance followed Individual S as he drove away from MOFFETT's residence. During the surveillance, BARRY WARE received an incoming call on Target Telephone Five from Individual S (call #556). Individual S stated "hey, uh, remember you were talking about your friend [GREGORIO RODRIGUEZ] the other day?" I believe Individual S was referring to the seizure of cocaine from RODRIGUEZ on June 3, 2007. WARE responded, "Yeah." Individual S replied "well, I got, uh, I got uh, about um three [unmarked law enforcement] cars behind me [conducting surveillance of Individual S] all the way from over there [where WARE and Individual S met at MOFFETT's residence]." Individual S told WARE that he would call him later. WARE told Individual S that he would call him on "the house phone". I believe that WARE wanted to use a different phone in order to avoid detection by law enforcement. Surveillance was unable to effectuate a traffic stop of Individual S. Following this surveillance of Individual S, law enforcement reviewed an unmarked photograph of Individual S and identified the person in the photograph as the same person they observed on surveillance leaving the meeting with WARE.

163.    On or about June 6, 2007, at approximately 1:20 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #577). WARE told McDONALD, "I'm gonna try that dude [Individual S] again. He supposed to be able to help us out [sell them cocaine] when he gets off work." McDONALD asked about "getting [cocaine] for [Individual R] and them." WARE stated that "We gotta get ourselves straight first and then will try to get [obtain cocaine for] [Individual R] and them."

164.    At approximately 1:34 p.m., BARRY WARE received an incoming call on Target Telephone Five from GARY McDONALD (call #578). McDONALD told WARE that "dude

[Individual R] just called and he needs two [kilograms of cocaine] now." WARE stated that he would talk to the guy [Individual S] and see what he says. McDONALD stated, "Call me man. Let me know something man. I'm thinking about just taking - rob [Individual R of the money he has for the keys of cocaine], fuck it." WARE stated that McDONALD "ain't fittin [is not serious to do that [commit the robbery]." McDONALD said, "Man fuck it, can't get him nothing. Ain't nothing on me. Man, I'll rob him for that 46,000 [$46, 000]." I know that $46,000 is consistent with the price for two kilograms of cocaine in the Joliet area in June 2007. WARE stated that he would check "it" (the status of the transaction with Individual S) out and call McDONALD back.

### Z.     September 13, 2007 Controlled Buy of 2 1/4 Ounces of Crack Cocaine from KEVIN WADDELL.

165.    On or about September 13, 2007, CS-4, at the direction of law enforcement, placed a telephone call to KEVIN WADDELL for the purpose of obtaining cocaine from KEVIN WADDELL. Law enforcement observed the call and were advised by the source that WADDELL directed CS-4 to meet WADDELL at a house located on 4th Avenue in Joliet, Illinois to conduct a transaction for 2 1/4 ounces of cocaine.[14] Law enforcement searched CS-4 and his/her vehicle for the presence of drugs, money, or other contraband, with negative results. Law enforcement then provided CS-4 with $1,200 for the purpose of buying 2 1/4 ounces of crack cocaine, and outfitted CS-4 with a body recording device.

166.    Surveillance followed CS-4 as he/she drove to the 600 block of 4th Avenue where CS-

---

[14] Agents attempted to record both the telephone call to WADDELL as well as the subsequent meeting between WADDELL and CS-4 with a recording device. Upon attempting to download the recording device, it was discovered that the device had malfunctioned and that none of the above was recorded. The device has since been sent to Chicago FBI Headquarters for evaluation and repair.

4 remained under the surveillance of agents. Shortly after CS-4's arrival, surveillance observed an

individual they recognized as KEVIN WADDELL and an unknown black male passenger arrive in

the area in an orange Dodge Caliber, bearing Illinois registration X647612 (hereinafter "the

Caliber"). Illinois Secretary of State records reflect that the Caliber is registered to Individual BB,

711 S. Des Plaines Street, Joliet, Illinois.

167.    Surveillance observed WADDELL exit the Caliber and meet with CS-4 in the front

yard of a residence in the 600 block of 4th Avenue. Surveillance observed WADDELL and CS-4 talk

briefly, conduct a hand-to-hand exchange, and continue to talk while WADDELL's passenger

remained in the Caliber. WADDELL subsequently re-entered the Caliber and left the address.

168.    Surveillance followed CS-4 as he/she drove away from the area to a prearranged meet

location. Once at the prearranged meet location, CS-4 provided law enforcement with plastic wrap

that contained an off-white, rock-like substance. Law enforcement searched CS-4 for drugs, money

and other contraband, with negative results, and recovered the body recording device. CS-4 told law

enforcement that WADDELL gave CS-4 the plastic wrap containing the suspected crack cocaine

while in the front yard of the residence on the 600 block of 4th Avenue. CS-4 further explained that

he/she gave WADDELL $1,200 for the crack cocaine.

169.    The DEA North Central Laboratory analyzed the contents of the plastic wrap and

found it to be 55.3 grams of mixtures and substances containing cocaine base. The substance also

contained sodium bicarbonate. Based on my experience as a FBI Special Agent and the experience

of other law enforcement officers and agents, I believe that the cocaine is the form of crack cocaine.

76

**AA.    September 13, 2007 Controlled Buy of 2 1/4 Ounces of Cocaine BARRY WARE.**

170.    On or about September 13, 2007, CW-3, at the direction of law enforcement, placed several telephone calls to Target Telephone Four for the purpose of obtaining cocaine from BARRY WARE.  During these calls, WARE agreed to front 4 ½  ounces of cocaine to CS-3 for $1,400. WARE and CS-3 further agreed that the transaction would take place at Joe's Hot Dogs, 810 Plainfield Road in Joliet.  These calls were not recorded.  Phone records for Target Telephone Four confirm CW-3's account of his/her telephone contacts with WARE.

171.    Later that same day, law enforcement met with CS-3 at a prearranged meet location. Law enforcement searched CS-3 and CS-3's vehicle for drugs, money and other contraband, with negative results.  Law enforcement allowed CS-3 to have $20 on his/her person during the transaction and outfitted CS-3 with a body recording device.  Law enforcement surveilled CS-3 as he/she drove to Joe's Hot Dogs, where surveillance had been established at approximately 7:00 p.m. Surveillance observed CS-3 arrive at Joe's Hot Dogs at approximately 7:15 p.m.  Surveillance observed CS-3 exit his/her vehicle and meet with WARE, who had been at Joe's Hot Dogs standing next to a bicycle since approximately 7:05 p.m.  At approximately 7:16 p.m., surveillance observed CS-3 and WARE walk to CS-3's vehicle.  At approximately 7:17 p.m., surveillance observed CS-3 enter the driver's side of the vehicle, while WARE entered the passenger's side of the vehicle.  At approximately 7:18 p.m., surveillance observed WARE exit CS-3's vehicle, walk toward the area where he left his bicycle and depart the area on his bicycle.

172.    Surveillance followed CS-3 as he/she drove from Joe's Hot Dogs to a prearranged meet location, where CS-3 provided law enforcement with a brown paper bag containing a white, powdery substance.  Law enforcement searched CS-3 and CS-3's vehicle for drugs, money and other

contraband, with negative results. Law enforcement also recovered the body recording device from CS-3.[15] CS-3 told law enforcement that when WARE entered CS-3's vehicle, WARE told CS-3 that the paper bag contained "two and a quarter" (2 1/4 ounces of cocaine). According to CS-3, WARE stated that he would call the source later about providing the remaining 2 1/4 ounces to CS-3.

173.    The DEA North Central Laboratory tested the contents of the bag, which it found to be approximately 62.4 grams of mixtures and substances containing cocaine.

174.    On or before September 21, 2007, CS-3 had a series of unrecorded conversations with BARRY WARE on Target Telephone Four regarding payment for the 2 1/4 ounces of cocaine WARE fronted to CS-3 on September 13, 2007. Phone records for Target Telephone Four confirm CS-3's account of his/her telephone contact with WARE.

175.    At approximately 2:28 p.m., CS-3 made a recorded call to BARRY WARE on Target Telephone Four. During the call, CS-3 told WARE that he would have the money soon. WARE instructed CS-3 to call him back when CS-3 had the money. At approximately 3:40 p.m., CS-3 made a recorded call to WARE on Target Telephone Four. During the call, WARE told CS-3 that he would call CS-3 back and have the CS-3 bring the "change" (money) to him. At approximately 5:21 p.m., CS-3 made a recorded call to WARE on Target Telephone Four. During the call, WARE instructed CS-3 to "come over to that Auto Zone in front of Larken Village [in Joliet]."

176.    Law enforcement subsequently searched CS-3 and CS-3's vehicle for drugs, money and other contraband, with negative results. Law enforcement provided CS-3 with $1,100 with

---

[15]Upon attempting to download the recording device, it was discovered that the device had malfunctioned and that none of the above was recorded. The device has since been sent to Chicago FBI Headquarters for evaluation and repair.

which to pay WARE for the cocaine WARE fronted to CS-3 on September 21, 2007. Law enforcement also outfitted CS-3 with a body recording device.

177.    Surveilled followed CS-3 as he/she drove to the Auto Zone at 875 N. Larken. Shortly after CS-3's arrival, surveillance observed WARE enter the passenger's side of CS-3's car. Surveillance observed WARE remain in CS-3's car for a few minutes, after which WARE exited the car and CS-3 drove away from the area.

178.    Surveillance followed CS-3 away from the Auto Zone to a prearranged meet location, where CS-3 was searched for drugs, money and other contraband, with negative results. Law enforcement also recovered the body recording device from CS-3. CS-3 told law enforcement that he/she gave WARE the $1,100 while WARE was inside of CS-3's vehicle. The body recording device reflects that CS-3 explained to WARE that he was "short" $300 that CS-3 owed to WARE. CS-3 told WARE that CS-3 had given the money to DEVON TYLER, who needed the money for bail.

**BB.    October 3-4, 2007 Calls Regarding Cocaine Distribution and the Collection of Cocaine Proceeds Involving BARRY WARE and BOBBY MITCHELL.**

179.    On or about October 3, 2007, at approximately 10:39 a.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6058). WARE asked, "What's going on Bob?" MITCHELL replied, "You know, I got that twelve [$1,200] and I'm working on another twelve [$1,200]. If you just give me a little time, I'll call you later on and you come pick up the twenty-four [$2,400]. Cause I'm on my thang today dog." WARE stated, "BOBBY, BOBBY, that put the tab, when I gave you that [supply of cocaine], that out the tab back at three-six [$3,600], right?" MITCHELL replied, "Yeah, it's three-six [$3,600] but, what I'm sayin'

is, I already had ten [$1,000] last night. I only had to make two [$200]. I made that two [$200].

Now, I'm gonna make up the first twelve [$1,200]. I'm gonna give you twenty-four [$2,400] and

then, when I get the other twelve [$1,200], I'm gonna give that." WARE stated, "That sounds good

Bobby." MITCHELL stated, "I'm at work [selling cocaine] dog. I'm gonna get back with you."

Based on the foregoing, I understand that WARE fronted approximately $3,600 of cocaine to

MITCHELL, which MITCHELL was in the process of selling. I further know that $3,600 is

consistent the price for approximately three 2 1/4 ounce quantities of cocaine in the Joliet area in

October 2007.

180.    At approximately 4:50 p.m., BARRY WARE received an incoming call on Target

Telephone Four from BOBBY MITCHELL (call # 6137). WARE asked, "What's up Bobby?"

MITCHELL stated, "Listen here. I got one more special somebody [narcotics customer] come by

here, holler at me when they get off. Then I'm gonna call you. If you want me to bring it [narcotics

proceeds] to you or if you want to come get it [narcotics], I'll have twenty-four [$2,400] for you,

dog." WARE asked, "How long is it gonna be?" MITCHELL stated, "It should be, what time is it?

Five o'clock? It should be probably in the next hour. I'm gonna give you twenty-four [$2,400] and

then I'm gonna work on the other twelve [$1,200]." WARE stated, "Okay." MITCHELL stated,

"That's what I'm talking about, business. I'll holler back." WARE stated, "Okay."'

181.    At approximately 5:44 p.m., BARRY WARE received an incoming call on Target

Telephone Four from BOBBY MITCHELL (call #6158). WARE asked, "What's up Mitch?"

MITCHELL replied, "Well, this nigger [customer] still ain't come through. They always one nigger

that hold you up. I will have had it, but do you want this twenty-two [$2,200]?" WARE stated,

"Hell yeah. I got to pay somebody [WARE's narcotics supplier]." MITCHELL replied, "Ain't no

problem. What you want me to do?" WARE told MITCHELL, "Jump on the highway and come to McDONALD's by JUCO [Joliet Junior College]." MITCHELL stated, "Alright."

182.    On or about October 4, 2007, at approximately 9:42 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6464). MITCHELL stated, "What's up player?" WARE stated, "I got it mixed up. You had gave me two-three [$2,300] last night [when MITCHELL delivered narcotics proceeds to WARE]." MITCHELL stated, "Thank you." WARE stated, "That was my fault." MITCHELL stated, "I damn near got you all the way through [has nearly repaid all of the money he owed to WARE for the cocaine that he fronted him]." WARE asked, "What you looking like now Bobby?" MITCHELL stated, "I think either six [$600] or seven [$700]. By Friday, I'm gonna clear it up tomorrow." WARE told MITCHELL "Holler at me cause I'm going out of town tomorrow." MITCHELL stated, "We most definitely got to do that before you leave." WARE stated, "I'm gonna holler at you before I leave. I ain't gonna leave you high and dry [without any cocaine to sell]." MITCHELL stated, "Alright."

### CC.    October 4-5, 2007 Distribution of Cocaine and Preparation of Crack Cocaine Involving BARRY WARE and GERALD LINDSEY.

183.    On or about October 4, 2007, at approximately 11:14 a.m., WARE placed an outgoing call on Target Telephone Four to GERALD LINDSEY (call #990). WARE asked LINDSEY, "You ready Fat Boy?" LINDSEY told WARE, "Yeah, I gotta go grab it on top real quick [LINDSEY needed to get his money together]. About twenty minutes." WARE told LINDSEY to be ready "so I can get you out the way [make a delivery of cocaine to LINDSEY] cuz I'm gonna be gone."

184.    At approximately 1:28 p.m., BARRY WARE received an incoming call on Target Telephone Four from GERALD LINDSEY (call #1002). LINDSEY asked WARE, "What's your

fat ass waiting on?" WARE stated he was waiting on LINDSEY to call. LINDSEY said he was

waiting on WARE. LINDSEY then stated. "Old girl at the crib got that for you [an unknown female

at the house had the money to pay for the cocaine that WARE was providing]." WARE stated

"okay." LINDSEY then confirmed, "I ain't gotta wait though so you gonna take that [cocaine] to

her then, right?" WARE stated, "You gonna be all right man. You ain't gotta wait [for the cocaine].

I ain't fittin' to do that, okay." LINDSEY then asked, "Man, is that the same shit [cocaine] that guy

was moving dude, because if it is man, you ought to play with it [do something to it to make it

appear to be of better quality]."

185.    At approximately 6:29 p.m., BARRY WARE received an incoming call on Target

Telephone Four from GERALD LINDSEY (call #1016). WARE told LINDSEY, "Let me come

over there." LINDSEY said, "Alright." WARE asked, "What you got, trey [three thousand dollars],

right?" LINDSEY stated, "Do I got it? Yeah, I got three [$3,000]."

186.    At approximately 8:41 p.m., BARRY WARE received an incoming call on Target

Telephone Four from GERALD LINDSEY (call #1019). LINDSEY simply stated, "Man, dude, that

some bunk [poor quality cocaine]." I believe that shortly before this call, WARE had delivered

cocaine to LINDSEY.

187.    At approximately 8:42 p.m., BARRY WARE placed an outgoing call on Target

Telephone Four to GERALD LINDSEY (call #1021).

      a.    During the call, LINDSEY stated, "Man dude, that's some fuckin' bunk [poor

quality cocaine], and that's on everything that I love. That's some fuckin bunk [poor quality

cocaine]." WARE replied, "Ain't nothing wrong with that. That shit [cocaine] powerful as hell."

LINDSEY stated, "Dude, that shit [cocaine] is bunk [of poor quality]. I'm telling you. I ain't put

nothin' little in it. A little water. That shit's bunk boy. And then when I had it, it look like whoever

had it re-rocked [added adulterants to the cocaine] that shit nigger. I don't know what the fuck you

did or dude did or whatever but this shit is bunk, straight up, it's bunk."

        b.      Later during the same call, WARE asked, "How much [of the cocaine] you

done did [cooked into crack cocaine]?" LINDSEY then detailed the process he went through to

convert the cocaine that WARE gave him into crack cocaine, stating, "I took a half out with no salt.

Then I put the four in there, put a little salt in there, a little water, not a lot of water. Cooked it till

it cleared up. Then I put that shit in there then that shit got foggy. The whole thing got foggy like

there was something in the junk. Then that shit went straight brown. I can't lose like this dog. I

cannot lose like this. I swear to God. That shit [cocaine] bunk [of poor quality]." WARE replied,

"Every time I do something with you and I let you do it [cook the cocaine into crack cocaine], you

fuck the shit up GERALD and say it's bunk. That shit is not bunk. I can take that shit and make

it jump like a motherfucker and I ain't got to do nothing to it. Now what you talking about you

lost?" LINDSEY stated, "I ain't never called you. When I lose I accept it dude, you know it. I don't

never call you on no dumb shit. I done everything right [cooking the cocaine into crack cocaine],

you said it was easy. If it was that synthetic shit, I wish you would have did it [cooked it]. Shit, if

it was easy, common sense could bring that back." WARE asked again, "So how you lost? What

you talking about you lost?" There were some inaudible statements by LINDSEY, after which

LINDSEY stated, "I fixin' to weigh the rest of it up. I know it sound like I'm mad at you cuz, but

dude, I lost big time. I wish you would have did it." WARE stated, "You don't even know. You

ain't even weighed the shit out."

        188.    At approximately 8:46 p.m., BARRY WARE received an incoming call on Target

Telephone Four from GERALD LINDSEY (call #1023). LINDSEY stated, "Man this shit [cocaine] is bunk [of poor quality]. I would love to see you cook some of this [into crack cocaine] in front of my face. This shit bunk dog. I'm telling you it's re-rock [adulterated powder cocaine that has been pressed to appear as though it has not been adulterated] BARRY. I don't know if I got a bad batch of it or something. I'm telling you, you put some water in it, it isn't supposed to fog up. This shit fogs up." WARE stated, "That ain't no re-rock [cocaine]." LINDSEY stated, "BARRY, I did everything right man. This shit man, I took a half off that shit. All I got was a little over two, I got like and fuckin' two point one grams.[16] That shit is crazy. Hat Rack [an alias for an associate of LINDSEY] sitting right here, and all the shit I used to do, and he watching. It'll come back clear. That shit is just ridiculous. I believe you. I believe you. I don't know what the fuck I did man. I was looking pitiful."

189.    At approximately 8:47 p.m., BARRY WARE received an incoming call on Target Telephone Four from GERALD LINDSEY (call #1025). WARE asked LINDSEY, "How much did it come back?" LINDSEY stated, "Man, I put the four in there and that shit came back two and... two point one [2.1 ounces]." WARE asked, "What do you mean 2.1?" LINDSEY stated, "It came back 2, 56 [56 grams] and then I took the half out of it and I had took a little piece out of the two something that I had sold somebody else. That shit came back at 2, 56 to 2.1, so that's 58, 51...59, that's what it came back, 59 [59 grams]. And I did not do nothing wrong cuz, I don't know what the fuck. I just got, I don't know if I got ganked [cheated]. If you prove to me then I'll take the loss. I don't know what the fuck, to me, I ain't never seen it fog up. That shady shit from dude had used

---

[16] Based upon later discussions between WARE and LINDSEY, it is apparent that LINDSEY meant to say 2.1 ounces, not 2.1 grams.

to fog up and I knew that was re-rock. And that's the only time I know re-rock. When it fog up like that. I know you know your shit, so I don't know man, I'll take the motherfuckin' heat. I don't understand why the shit just. Man, I don't know what the fuck! Motherfucker ain't get their change back up out of this shit [Lindsey will lose money selling this poor quality cocaine]."

190.    At approximately 8:49 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to GERALD LINDSEY (call #1026). WARE stated, "I just say that everybody happy with the shit [the cocaine that WARE provided to others in the WARE Organization] and you the only one that the shit done fucked up on [unable to make it into crack cocaine]. That's all I want to know." LINDSEY stated, "BARRY, I'm not saying that it's your fault cuz. I'm not sitting here and yelling about it's your fault dog. I am not doing that. I don't know what the fuck. When you only lookin' at two of them [two ounces of cocaine LINDSEY attempted to cook into crack cocaine], I'm lookin' at two of them dog. I ain't bullshittin'. Two of them and that little piece that I took out of it. I don't know what the fuck! I knew that I should've made you do it." WARE stated, "You just messed that shit up GERALD, that's all you did. But I'll tell you what. You want me to replace your shit [cocaine WARE had distributed to LINDSEY]. I can't take the whole blame, cuz you evidently ain't did something right GERALD. Then I'm doing this for somebody else, I'm gonna have to go in my pocket and do this. Before my man [WARE Organization worker] cut the shit [cocaine] loose we check the shit, like we always do. Took the motherfucker and made it into two, double up for me [WARE was able to add adulterants to cocaine from the same batch and double the amount when he cooked it into crack cocaine]." LINDSEY stated, "I know dog. I ain't blaming you man." WARE stated, "That's why I called you, maybe I should've did the shit [cooked the cocaine into crack cocaine]. That's why I called you and said hey, you gonna like that. I don't sell

no bullshit [poor quality crack cocaine]."

191.    On or about October 5, 2007, at approximately 5:31 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to GERALD LINDSEY (call #1045). LINDSEY asked WARE if he could talk or if WARE was going to call his phone back. WARE told LINDSEY he could talk. LINDSEY told WARE that he "had [Individual DD] do that half I got [cook ½ ounce of cocaine into crack cocaine]. I don't know what it is, but that little piece I got was 're' [re-rock cocaine]. Cuz dude just did that motherfucker, that motherfucker came back 7.1 [grams], and that was a 14 [Individual DD started with 14 grams or one-half ounce]. So whatever the fuck that shit was, I knew I knew what I was doing. So I don't know how we gonna do this, then. I just watched him. I know he's real good [at cooking cocaine into crack cocaine]. He been doing that shit for dude for years. I made sure he didn't put nothing on it so. Maybe I just got a little ugly part of it, maybe. I don't know. It's possible."

192.    At approximately 5:32 p.m., BARRY WARE placed an outgoing call on Target Telephone Four to GERALD LINDSEY (call # 1046). WARE asked LINDSEY, "Who brought it back?" LINDSEY stated, "[Individual DD]." Seconds later LINDSEY stated, over Target Telephone Four (call #1047), "Right, cuz I was trying to see what the hell I was doing wrong and I know he [Individual DD] a chef [good at cooking cocaine into crack cocaine]."

193.    Within seconds again, at approximately 5:32 p.m., BARRY WARE received an incoming call on Target Telephone Four from GERALD LINDSEY (call #1048). LINDSEY stated that "[Individual EE] was there too and he knows his shit [how to cook cocaine into crack cocaine] too." WARE stated that he was on his way "down to the Classic [Circle City Classic auto show in Indianapolis, Indiana]." LINDSEY said that he was calling to let WARE know that some parts of his "shit [cocaine]" is "kinda shady [poor quality]." WARE then told LINDSEY about "[Individual

86

DD]" getting pulled over by law enforcement right after WARE saw him and got "some change [money] from him."[17]  Regarding the cocaine that WARE provided to LINDSEY, WARE agreed, "We'll meet each other half-way." I believe WARE was agreeing to reimburse LINDSEY for one-half of the cocaine WARE had sold to him. LINDSEY told WARE to check and see if others are complaining.

**DD.    October 5, 2007 Calls Regarding the Distribution of Cocaine Involving BARRY WARE and GARY McDONALD.**

194.    On or about October 5, 2007, at approximately 6:08 p.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #6701). McDONALD told WARE, "You're a pussy-assed dude man. This motherfucking thing [cocaine] that you gave me that was different motherfucker. This gummy-assed [poor quality] shit. You know what's up with it [the quality of the cocaine]." WARE stated that "that stuff [cocaine] ain't gummy." McDONALD stated, "It is - damn, I'm sittin' here doin' it [repackaging the cocaine] . . . this shit [cocaine] is crazy [of poor quality] man." WARE stated, "then let me have it, I'll cook it [make it into crack cocaine], I'll buy it [the cocaine] from you." McDONALD stated, "I'm putting it into games [smaller quantities for resale] and it's real moist like." WARE asked McDONALD, "You didn't have it [the cocaine] nowhere crazy did you?" McDONALD said, "Hell no." WARE said "That's the best one [portion of the cocaine] right there, the solid one. To me, that was the best one." McDONALD stated that he liked the "other one" (cocaine supply) better. WARE stated, "yeah, that's that Carribean - the flake."

---

[17]Individual DD was pulled over by law enforcement with the Joliet Police Department on October 5, 2007, just after leaving 812 Horseshoe Drive, Joliet. Individual DD had a warrant for his arrest and a search incident to arrest revealed that Individual DD had a small amount of cocaine (2.13 grams) on his person. Individual DD was subsequently charged in state court with possession of a controlled substance.

195.    On or about October 5, 2007, at approximately 6:14 p.m., BARRY WARE received

an incoming call on Target Telephone Four from GARY McDONALD (call #6703). WARE stated,

"The way you fix that [soggy cocaine] is you put it [the cocaine] in the thing [microwave] for 30

seconds or so." McDONALD stated that he knows how to do it. McDONALD stated, "that's what

they [his cocaine customers] gotta do to it. I ain't got time for that."

**EE.    October 6, 2007 Seizure of 4 ½ Ounces of Crack Cocaine from BOBBY MITCHELL Involving BARRY WARE, LAQUINTA MOFFETT, and BOBBY MITCHELL.**

196.    On or about October 6, 2007, at approximately 10:53 a.m., BARRY WARE received

an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6853). MITCHELL

asked WARE, "Is we up and around now?" WARE stated, "Yeah, I'm gonna have to get MELVIN

[HOLMES] to get to you. Let me call him now." MITCHELL stated, "Now, you know I'm hungry

man [eager to buy cocaine]. You know I went without, dude, just to get you right. So, now I get the

two [two 2 1/4 ounce quantities of crack cocaine] and the one [one 2 1/4 ounce quantity of crack

cocaine], right?" WARE stated, "I'm gonna have to get this girl [LAQUINTA MOFFETT] to do

it [deliver the crack cocaine], BOBBY. I'm gonna have to give you the two [two 2 1/4 ounce

quantities of crack cocaine] and then give you the one [one 2 1/4 ounce quantity of crack cocaine]

when I get back. I'm out of town right now. I'm gonna get you something [crack cocaine] until I

get back. I'll be back tomorrow." MITCHELL asked, "Do you want me to give that [money] to

them or you want me to hold it or what?" WARE told MITCHELL, "I think I'm gonna have you

give her [MOFFETT] that [money]. I think she needs some money. I'll call you right back. Let me

call her right now." MITCHELL stated, "Alright."

197.    At approximately 11:11 a.m., BARRY WARE received an incoming call on Target Telephone Four from LAQUINTA MOFFETT[18] (call #6858). After a brief period of small talk, WARE told MOFFETT, "Let me call you on another phone." I believe that WARE wanted to talk to MOFFETT on another phone regarding the upcoming crack cocaine transaction with BOBBY MITCHELL. Law enforcement subsequently established surveillance in the vicinity of MOFFETT's residence.

198.    At approximately 12:00 p.m., law enforcement observed BOBBY MITCHELL enter the parking lot of Bobby McGee's Tavern located at the corner of Gael and Ingalls in Joliet. MITCHELL was driving the Lexus. The parking lot is located in the same area as MOFFETT's residence.

199.    At approximately 12:03 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6869). During this seven second telephone call, WARE told MITCHELL, "I'm fittin' to tell her [LAQUINTA MOFFETT] to come over there [to deliver the crack cocaine]." MITCHELL stated, "Alright."

200.    At approximately 12:13 p.m., BARRY WARE received an incoming call on Target Telephone Four from LAQUINTA MOFFETT (call #6870). WARE told MOFFETT, "Damn, I was just fittin' to call you. Go over there, LuLu [to deliver the crack cocaine]. He [BOBBY

---

[18]The identification of LAQUINTA MOFFETT in this Affidavit is based on the following information. First, law enforcement identified MOFFETT during surveillance. Second, law enforcement has been able to identify MOFFETT's voice because: that voice has been intercepted numerous times on Target Telephone Four and Target Telephone Five; MOFFETT was identified or identified herself in many of those calls by name or by aliases, including "Quinta"; during particular intercepted calls, MOFFETT arranged to meet with certain co-conspirators and those meetings were surveilled by law enforcement; and the voice was consistently associated with the same phone numbers, particularly (815) 744-5065, (815) 212-4976, and (815) 823-6262. These phone numbers are subscribed to LAQUINTA MOFFETT, 1107 Gael Drive, Unit B, Joliet, Illinois. Illinois Secretary of State records reflect MOFFETT's address is 1107 Gael Drive, Unit B, Joliet, Illinois.

MITCHELL] over there. I was just fittin' to call you." MOFFETT stated, "Okay."

201.    At approximately 12:14 p.m., surveillance observed a maroon Chrysler bearing Illinois license registration 6383463 (hereinafter "the Chrysler") exit the parking lot of 1107 Gael Drive, MOFFETT's residence. Illinois Secretary of State records reflect that the Chrysler is registered to Individual II at 417 E. Bellarmine, Joliet, Illinois. The vehicle drove north and entered the parking lot of Bobby McGee's Tavern. Surveillance observed LAQUINTA MOFFETT exit the Chrysler and walk toward the Lexus in which BOBBY MITCHELL was sitting. Surveillance observed MOFFETT lean into the passenger window of the Lexus. Surveillance then observed MOFFETT back away from the Lexus and re-enter the Chrysler in which she had arrived. I believe that MOFFETT distributed crack cocaine to MITCHELL while she was leaning into the Lexus. Surveillance saw MOFFETT drive away from the parking lot and return to her residence.

202.    At approximately 12: 16 p.m., surveillance observed MITCHELL drive away from the parking lot in the Lexus. As MITCHELL was driving away, at approximately 12:17p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6874). MITCHELL, referring to LAQUINTA MOFFETT, stated, "Where you get that woman from man?" WARE and MITCHELL then talked about WARE hiding his women from MITCHELL.

203.    Shortly thereafter, based on the foregoing intercepted conversations, law enforcement conducted a traffic stop of the Lexus. During the stop, law enforcement conducted a pat-down search of MITCHELL. Law enforcement found a cigar box in MITCHELL's right pants pocket. The box contained a clear plastic baggie containing eleven smaller clear plastic baggies, each of which contained an off-white, rock like substance. During the stop, law enforcement also searched the Lexus. Law enforcement found a white plastic shopping bag in the center console area of the

Lexus. The bag contained a clear, plastic zip-lock bag that contained solid chunks of off-white rock-like substance. Law enforcement released MITCHELL without charges in to preserve the secrecy of the ongoing investigation.

204. The DEA North Central Laboratory analyzed the contents of the eleven plastic baggies found on MITCHELL. The analysis identified the substances as 4.8 grams of mixtures and substances containing cocaine base. They also contained sodium bicarbonate. The Laboratory also analyzed the contents of the plastic zip-lock bag found in the Lexus. The analysis identified the contents as 123.8 grams[19] of mixtures and substances containing cocaine base. The contents also contained sodium bicarbonate. Based on my training and experience as a FBI Special Agent and the experience of other law enforcement agents and officers, I believe that the cocaine base seized from MITCHELL and MITCHELL's Lexus is in the form of crack cocaine.

205. At approximately 12:19 p.m., BARRY WARE received an incoming call on Target Telephone Four from LAQUINTA MOFFETT (call #6883). WARE asked, "What up LuLu?" MOFFETT stated, "Yeah, I got it [money from BOBBY MITCHELL for the crack cocaine]." WARE stated, "What I tell you about enticing my motherfuckin' friends? Bobby [MITCHELL] was like, man, where you get that motherfucker from?" MOFFETT stated, "I can't help it I'm fine [attractive]."

206. At approximately 1:24 p.m., BARRY WARE received an incoming call on Target Telephone Four from BOBBY MITCHELL (call #6907). MITCHELL told WARE, "Dude, don't say nothing. Absolutely nothing. When you get in town, come and see me. It's important." WARE said, "I'm gonna call you on another line. I got another line." MITCHELL stated, "Well, listen, I

---

[19]123.8 grams is consistent with WARE's distribution to MITCHELL, via MOFFETT, of two 2 1/4 quantities of crack cocaine.

need to get to another phone then. I ain't gonna talk to you. Listen, when I get to where I'm going, we gotta find a way we can talk. Okay. I say, you call me on another line. When I see that number, I'm gonna call you from another phone." WARE stated, "Okay." I believe MITCHELL was seeking to speak to WARE regarding the seizure of crack cocaine from MITCHELL. I further believe MITCHELL was asking to speak with WARE on different phones to avoid detection by law enforcement.

**FF.    October 11, 2007 Identification of a New Source of Cocaine Supply Involving BARRY WARE and GARY McDONALD.**

207.    On or about October 11, 2007, at approximately 11:33 p.m., BARRY WARE received an incoming call on Target Telephone Four from GARY McDONALD (call #1248). McDONALD told WARE "you all don't want to give me nothin', man I found me a nigga last night boy, a nigga! Got some fly boy [high quality cocaine]." WARE asked McDONALD who it was. McDONALD stated, "We're over all that man. We're over all that. Man B. You come look at this shit [cocaine] man. We ain't have no shit [cocaine] like this [of such high quality] man." McDONALD stated, "It's like that real flaky shit [high quality cocaine]. I mean like just, that motherfucker look like diamonds and pearls." WARE asked for "a little bit [of the high quality cocaine]." McDONALD joked that he didn't know what WARE was talking about. WARE laughed. McDONALD stated that "it's eleven [$11,000 for ½ kilogram]." McDONALD then stated that "I think they [the supplier] got a lot of it [high quality cocaine]." McDONALD stated that the supplier was going to bring the "other half [kilogram]" back at a later date. WARE asked "what was the number [price] on it [for a kilogram]?" McDONALD stated "22 [$22,000]." McDONALD stated again, "We ain't have no shit [cocaine] like this [high quality] B."

### GG.    October 15, 2007 Calls Regarding Cocaine Distribution Involving BARRY WARE Involving GERALD LINDSEY.

208.    On or about October 15, 2007, at approximately 11:18 a.m., BARRY WARE received an incoming call on Target Telephone Four from GERALD LINDSEY (call #1415).  WARE stated, "Gerald, give me something to play with [some cocaine to sell] so I can get back on my feet man." LINDSEY stated, "Man, I tell you, we all tryin' to do something right now, me, B, and Fat Boy. Don't act like you ain't got nothing [no money with which to buy cocaine] dude. I know you ain't rich, but, shit, you ain't broke neither motherfucker."  WARE stated, "Yes I am GERALD." LINDSEY stated, "Made man do not be broke. You a made man, brother. You take care of yourself and business.  A made man never be broke. [Individual K] is what you call an 'AL-7,' he ain't a made man. You a made man. You ain't gonna never be broke.  If you be broke, you be dead or in jail. That's the only thing gonna stop you for being broke, cause you a made man. I gotta give that to you. Stop playin'.  You might not have what you want to have [with respect to cocaine or cocaine proceeds] right now nigga but you ain't broke."  WARE then insisted, "I don't have any money to my name. I gotta build up [the WARE Organization drug trafficking business], build back and be straight. I ain't straight right now [WARE cannot get cocaine to sell]."  LINDSEY stated, "Yeah. I ain't got much [cocaine] to give you brother but your welcome to get anything I got. Just sell it and get you some, brother. I know you gonna pay me one day. Shit, I'm telling you I'm trying to get a little piece [ounce of cocaine] right now. I got a gank of bills, BARRY. Lights, gas, water. I know you got all that too.  I pay $1,100 a month. Then I gotta pay one car note on that black truck.  I manage it."  LINDSEY proceeded to discuss how he filed Chapter 7 bankruptcy and how he "was gonna clear my shit [credit] up so I can really be straight."

209.    At approximately 11:23 p.m., BARRY WARE received an incoming call on Target Telephone Four from GERALD LINDSEY (call #1420). LINDSEY told WARE to "take this change

[money], though, man. We gotta do something with it dude. Get us something [cocaine]." WARE

asked, "How much [money] you all got GERALD?" LINDSEY replied, "Shit dude [one person

seeking to buy cocaine], I think he trying to get a four piece [four ounces of cocaine]. I don't know

what dude over there [another person seeking to buy cocaine] trying to get. I can get something

together [collect some money] real quick and let you know." WARE stated, "I got to make some

calls first." LINDSEY stated, "Alright, I'm going try to get together and give you a digit [a dollar

amount] on what we got. I sure wish I had to give you. I got shit, maybe three [of a quantity of

cocaine] saved though. That's for a rainy day. You welcome to get that motherfucker [cocaine] if

you want it." WARE stated, "Alright, I'll holler to you about it." LINDSEY replied, "There you go.

Now you know I ain't phony motherfucker. I'm just trying to manage my bills that's all. I'm

offering it [cocaine] to you nigga. You welcome to get it [cocaine]. Plus, I told you welcome to take

one of my trucks[20] and whatever and do whatever [transport cocaine or pick up cocaine proceeds

using the trucks]. I don't give a fuck. I hope you look out for me. I just wanna let you know I ain't

like none of the other motherfuckers. It's all real with me. I don't deal with no bullshit with you.

I don't want a motherfucker to give me nothing." WARE stated, "Alright. I got you."

### HH.    October 18, 2007 Controlled Buy of 2 1/4 Ounces of Crack Cocaine from DEVON TYLER.

210.    On October 18, 2007, at approximately 8:25 p.m., law enforcement met with CS-5

at a predetermined location for the purpose of obtaining 2 1/4 ounces of crack cocaine from DEVON

TYLER. To obtain the cocaine from TYLER, CS-5 contacted Individual FF. Prior to the evening

of October 18, 2007, CS-5 had discussed the purchase of 2 1/4 ounces of crack cocaine with

---

[20] Law enforcement has observed GERALD LINDSEY to be in possession of two Ford
Expeditions - one white, the other black. Illinois Secretary of State records reflect that
LINDSEY is the registered owner of one white Ford Expedition, Illinois registration 8127802,
and one black Ford Expedition, Illinois registration G181586.

Individual FF. Those conversations were not recorded.

211.    At approximately 8:35 p.m., at the direction of the FBI, CS-5 placed a consensually recorded call to Individual FF at telephone number (815) 666-7507. Individual FF advised CS-5 that he had not contacted DEVON TYLER.

212.    At approximately 8:53 p.m., CS-5 placed another consensually recorded call to Individual FF. Individual FF advised that TYLER was not answering his telephone. Individual FF agreed to call TYLER again. CS-5 spoke with Individual FF in consensually recorded calls several more times between 8:53 p.m. and approximately 9:50 p.m. During these calls, CS-5 checked on whether Individual FF had reached TYLER to coordinate the distribution of crack cocaine to CS-5.

213.    At approximately 9:52 p.m., CS-5 had a consensually recorded conversation with Individual FF, during which Individual FF advised CS-5 that he had been in contact with TYLER and that CS-5 should come to Individual FF's residence, located at 715 N. Hickory Street, Joliet, Illinois.

214.    Law enforcement subsequently searched CS-5 and CS-5's vehicle for money, drugs and other contraband, with negative results. Law enforcement gave CS-5 $1,500 for the purchase of 2 1/4 ounces of crack cocaine, and outfitted CS-5 with a body recording device. Law enforcement surveilled CS-5 as he/she drove to Individual FF' residence at 715 N. Hickory Street..

215.    Surveillance observed CS-5 arrive at Individual FF' residence at approximately 10:02 p.m. Surveillance observed CS-5 and Individual FF remain outside of Individual FF's residence until CS-5 depart Individual FF's residence upon the completion of the transaction. At this time, Individual FF advised CS-5 that DEVON TYLER had told him the price for the 2 1/4 ounces of crack cocaine would be $1,350, "so you [CS-5] can make your profit [when reselling the crack cocaine]." At approximately 10:14 p.m., Individual FF received an incoming call in CS-5's presence

from a caller Individual FF identified as TYLER. Individual FF told the person he identified as TYLER that he was waiting on him.

216.    At approximately 10:44 p.m., surveillance observed DEVON TYLER arrived driving a four-dour Oldsmobile Aurora bearing Illinois registration 8245681 (hereinafter "TYLER's Aurora"). Illinois Secretary of State records reflect TYLER's Aurora is registered to Individual JJ and Individual KK at 311 N. Bluff, Joliet, Illinois. CS-5 gave Individual FF $1,350 for the purchase of the 2 1/4 ounces of crack cocaine. CS-5 then placed a telephone call to agents to advise that TYLER had arrived and that TYLER was in the car by the residence with his headlights on. Surveillance observed TYLER's Aurora in the location CS-5 had identified, and an individual matching the description of TYLER inside the vehicle. Surveillance saw Individual FF enter TYLER's Aurora. Less than a minute later, Individual FF exited TYLER's Aurora and walked toward CS-5. Individual FF gave CS-5 a plastic baggie containing an off-white chunky substance believed to be crack cocaine.

217.    At approximately 10:47 p.m., surveillance observed CS-5 drive away from Individual FF's residence. Surveillance followed CS-5 to the prearranged meet location ,where CS-5 arrived at approximately 10:50 p.m. CS-5 gave law enforcement a plastic baggie containing an off-white chunky substance. Law enforcement searched CS-5 for drugs, money and other contraband, and found $150, which represented the money remaining from the $1,500 in buy money law enforcement provided to CS-5 before the transaction. Law enforcement also recovered the body recording device.

218.    The DEA North Central Laboratory analyzed the contents of the plastic baggie and found them to be approximately 62.4 grams of cocaine base. The contents also contained sodium bicarbonate. Based on my training and experience as a FBI Special Agent and the experience of other law enforcement agents and officers, I believe that the cocaine base is in the form of crack

cocaine.

## II.    November 8, 2007 Controlled Buy of 2 1/4 Ounces of Cocaine from GARY McDONALD.

219.    On or about November 6, 2007, at approximately 12:00 p.m., CS-6, at the direction

of the FBI, placed a consensually recorded call to GARY McDONALD at telephone number (815)

671-5004 for the purpose of obtaining crack cocaine from GARY McDONALD.[21]    As set forth

below, McDONALD ultimately distributed cocaine rather than crack cocaine to CS-6.    During this

call, CS-6 asked McDONALD what he would charge him for "two and a quarter [2 1/4 ounces] -

hard [crack cocaine]."    McDONALD told CS-6 that he would have to check and call him back.    At

approximately 8:00 p.m. on that same day, CS-6 advised agents that GARY McDONALD had told

CS-6 in an unrecorded conversation that he would sell CS-6 three ounces of crack cocaine for $900

per ounce ($2,700).

220.    On or about November 7, 2007, agents met with CS-6 for the purpose of placing

another consensually recorded call to GARY McDONALD, again at telephone number (815) 671-

5004. CS-6 made several attempts with no answer before reaching McDONALD over the telephone.

During the call, CS-6 asked McDONALD about the "three" (ounces of cocaine) that they had

discussed the prior evening.    McDONALD advised CS-6 that he had already given him the price.

CS-6 asked McDONALD if he was always going to have to pay that much.    McDONALD told CS-6

that CS-6 would not.    CS-6 told McDONALD that he/she would not be ready until 7:00 or 8:00 p.m.

McDONALD told CS-6 to call him back at that time.    Later that evening, CS-6 made numerous

---

[21]    During the interception of calls to and from Target Telephone Four in October 2007, GARY McDONALD, using a telephone with number (815) 671-5004, was intercepted numerous times in conversation with BARRY WARE.    Additionally, on October 11, 2007 at approximately 4:23 p.m., BARRY WARE received an incoming call from Individual K. During this call, Individual K asked WARE what "Worm's" (GARY McDONALD) other phone number was. WARE told Individual K that McDONALD's number was "[815] 671-5004".

attempts, at the direction of the FBI, to call GARY McDONALD.  CS-6 repeatedly received a

voicemail message with GARY McDONALD's voice stating, "Call me back."

221.    On or about November 8, 2007, CS-6 advised agents that GARY McDONALD had

contacted CS-6, and told CS-6 that he was sick the previous evening and was asleep when the source

called.  CS-6 advised that he/she told McDONALD that he/she still wanted to get the crack cocaine

but that he/she needed to get the money back together.  McDONALD told CS-6 to call him when

he was ready.  The call was not recorded.

222.    At approximately 5:50 p.m., agents met with CS-6 at a pre-determined location.  CS-6

placed a consensually recorded call to GARY McDONALD at telephone number (815) 671-5004.

During this call, CS-6 and McDONALD further discussed the price of the crack cocaine.  CS-6

asked McDONALD if he would be willing to sell him the crack cocaine for "8 apiece" ($800 for

each ounce).  McDONALD advised that he was not willing to do that, stating that he would "be

losin' [money] like that."  CS-6 told McDONALD that he/she was still willing to do the deal.

McDONALD told the source to come toward the east side, by Richards Street, and give him a call.

CS-6 agreed to do this.  CS-6 then drove to another prearranged meeting location.

223.    Upon arriving at the second prearranged location, CS-6 placed another consensually

recorded call to GARY McDONALD at telephone number (815) 671-5004.  McDONALD told CS-6

to come to the parking lot of the barber shop on Richards Street.  CS-6 told McDONALD that he/she

would be there in a couple minutes.  Prior to leaving the location, law enforcement searched CS-6

and his/her vehicle for drugs, money, and other contraband, with the exception of $5, which was left

with CS-6.  Law enforcement outfitted CS-6 with a body recording device, and gave CS-6 $2,700

to purchase the crack cocaine.  Law enforcement then surveilled CS-6 as he/she drove to the barber

shop located at 121 Richards Street, Joliet, Illinois.

224.    Upon arriving at 121 Richards Street, surveillance observed CS-6 exited his/her vehicle and entered the front passenger seat of a Jeep Cherokee (hereinafter "the Cherokee") that was parked in the lot. After a short time, surveillance observed CS-6 exit the Cherokee and return to his/her vehicle. Agents surveilled CS-6 as he/she drove back to the prearranged meeting location. Upon arriving at the location, CS-6 provided law enforcement with a plastic baggie containing a single chunk of white substance. Law enforcement also recovered the body recording device from CS-6. Law enforcement searched CS-6 for money, drugs and other contraband, and recovered the $5 that CS-6 had on his/her person before the transaction.

225.    CS-6 told law enforcement that upon arriving at the barber shop, he/she received a telephone call from GARY McDONALD. CS-6 stated that McDONALD told CS-6 to get into the Cherokee that was parked in the same lot. CS-6 stated that he/she entered the front passenger seat of the Cherokee and observed McDONALD in the rear seat of the vehicle. CS-6 stated that there was an individual in the passenger seat and identified the individual by first name.[22] CS-6 stated that McDONALD handed him/her the plastic bag containing the single chunk of white substance. CS-6 stated that he/she then gave McDONALD the $2,700 in United States Currency. CS-6 stated that he/she asked McDONALD if he wanted to count the money. McDONALD told CS-6 that he trusted him/her. The conversation between McDONALD and CS-6 is reflected on the recording made on the body recording device.

---

[22]On the following day, November 9, 2007, agents showed CS-6 a photograph of Individual GG. Upon showing the photograph to CS-6, CS-6 immediately stated, "Yeah, that's him." Agents asked CS-6, "That's who?" CS-6 stated that it was a picture of the guy that was with GARY McDONALD during the controlled drug purchase the prior evening.

226.    The DEA North Central Laboratory analyzed the contents of the plastic bag and found them to be approximately 73.6 grams of mixtures and substances containing cocaine.[23]

## V.    PROBABLE CAUSE FOR REQUESTED SEIZURE FOR VEHICLES

227.    As set forth in this affidavit, I believe the facts contained herein establish probable cause that the defendants did commit a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

228.    This Affidavit is also made for the limited purpose of establishing probable cause in support of seizure warrants to seize the following vehicles as property constituting or derived from the proceeds the defendants obtained, directly or indirectly, as a result of the violations of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2, and property used or intended to be used in any manner or part to commit or facilitate the commission of said violation:

a.    2006 Dodge Charger - VIN 2B3KA53H16H178557 (registered to Individual A);

b.    2000 Buick Park Avenue - VIN 1G4CW52K2Y4166785 (registered to BARRY WARE);

c.    2004 Honda Pilot - VIN 2HKYF186X4H570483 (Registered to Individual B

---

[23] CS-6 negotiated a deal for three ounces of crack cocaine, the equivalent of approximately 84 grams. The analysis reflects that McDONALD distributed cocaine, rather than crack cocaine, to CS-6. Furthermore, the quantity of cocaine delivered by McDONALD to CS-6 was approximately 10 grams, between 1/4 and ½ ounce, short. CS-6 placed another consensually monitored telephone call to McDONALD the next day regarding the weight of the cocaine. McDONALD insisted that the cocaine weighed 84 grams when he gave it to CS-6. As previously discussed, McDONALD was intercepted over Target Telephone Five (call #158) telling BARRY WARE that WARE was "fucking up the game" (by not shorting customers on the weight of crack cocaine). Specifically, McDONALD and WARE discussed giving customers who had ordered three ounces of cocaine, 2 ½ ounces (approximately 70 grams) of cocaine instead. I believe that, consistent with McDONALD's strategy, McDONALD shorted the CS-6 by between 1/4 and ½ ounce.

and Individual C);

      d.     2007 Dodge Caliber - VIN 1B3HB28B77D239919 (Registered to Individual D); and

      e.     1997 Lexus ES 300 - VIN JT8BF22G0V0033843 (Registered to BOBBY MITCHELL).

(hereinafter VEHICLES A-E).  As set forth in this affidavit, there is probable cause to believe that upon conviction of the defendants, VEHICLES A-E will be subject to forfeiture.

      229.    Based upon my experience, I know that motor vehicles, like vehicles A-E, are easily transferred of hidden, thereby making them difficult to locate.  Moreover, I am aware that the appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area, making it difficult, if not impossible, to find for the purpose of forfeiture proceedings.  Additionally, motor vehicles can be transported outside the district further increasing the potential unavailability of these motor vehicles for forfeiture in the event of conviction.  Finally, I know that unless a motor vehicle is seized, it can be difficult to preserve the value of the motor vehicle for forfeiture purposes, because financial obligations relating to the vehicle, including insurance payments and loan obligations are not satisfied when an owner is given prior notice that his property will likely be subject to forfeiture.

      230.    In order to ensure that the availability of VEHICLES A-E is preserved for forfeiture, Title 21, United States Code, Section 853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property, and Title 21, United States Code, Section 853(f) states that, in the same manner as provided for a search warrant, a seizure warrant may be issued when the property would, in the event of a conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture.  Additionally, courts have long

recognized the unique circumstances involved in searching and seizing vehicles due to there inherent mobility, and the United States Supreme Court has found that the warrant less seizures of motor vehicles do not violate the Fourth Amendment of the United States Constitution where there is probable cause to believe that the automobile is subject to forfeiture, because the moveable contraband may be spirited away.

231.    Based upon the above, affiant hereby requests seizure warrants for VEHICLES A-E under § 853(f), because a restraining order or any other action is not sufficient to assure availability of the VEHICLES for forfeiture.

_____
JEREMY L. RESAR
Special Agent
Federal Bureau of Investigation


SUBSCRIBED TO AND SWORN BEFORE ME
this ____ day of February, 2008

_____
THE HONORABLE MARIA VALDEZ
UNITED STATES MAGISTRATE JUDGE